DOMINIQUE N. WESTMORELAND, ESQ. (SBN 302606)
E-mail: dwestmoreland@wml-law.com
YESHA H. PATEL, ESQ. (SBN 346474)
E-mail: ypatel@wml-law.com
RACHEL P. JACOBS, ESQ. (SBN 349947)
E-mail: rjacobs@wml-law.com
Direct: (424) 256-6837
THE WESTMORELAND LAW FIRM, P.C.
609 Deep Valley Drive, Suite 200
Rolling Hills Estates, California 90274
Telephone No.: (424) 285-5362
Facsimile No.: (424) 285-5825

Attorneys for Plaintiff, JOHN DOE

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

JOHN DOE,
Plaintiff,
v.
COUNTY OF LOS ANGELES; LOS ANGELES COUNTY DEPARTMENT OF PROBATION; CHIEF PROBATION OFFICER GUILLERMO VIERA ROSA; ANGELICA CHICAS; HEIDI DOE, last name unknown; and DOES 1 through 100, inclusive,
Defendants.

Case No.: 2:25-cv-06058

**FIRST AMENDED COMPLAINT FOR DAMAGES**

1. Violation of Civil Rights – 42 U.S.C. § 1983 (excessive force)
2. Violation of Civil Rights – 42 U.S.C. § 1983 (denial of medical and mental health care)
3. Violation of Civil Rights – 42 U.S.C. § 1983 (unconstitutional conditions of confinement and failure to protect)
4. Violation of Civil Rights – 42 U.S.C. § 1983 (Sexual Abuse/Invasion of Bodily

Privacy)

5. Violation of Cal. Civ. Code §§ 1708, 1708.5, 1708.5.5 (Sexual Assault and Battery of a Minor)
6. Intentional Infliction of Emotional Distress
7. Negligent Supervision, Hiring, and Retention
8. Negligence (Including Failure to Summon Medical Care – Gov. Code § 845.6)
9. Violation of the Bane Act (Cal. Civ. Code § 52.1)
10. Negligent Failure to Train, Warn, or Educate
11. Constructive Fraud (Cal. Civ. Code § 1573; Fed. R. Civ. P. 9(b))
12. Violation of Civil Rights - 42 U.S.C. § 1983 (Supervisor Liability)
13. Childhood Sexual Assault – Code Civ. Proc. § 340.1
14. Breach of Mandatory Duty – Cal. Gov. Code § 815.6
15. Violation of Civil Rights – 42 U.S.C. § 1983 (Municipal Liability for Unconstitutional Customs, Practices, Failure to Train and Supervise)

COMES NOW, Plaintiff JOHN DOE, does complain as follows

## I. PARTIES

1. Plaintiff JOHN DOE, was in the custody of the Los Angeles County Probation Department at Los Padrinos Juvenile Hall, a juvenile

detention facility located at 7285 Quill Drive, Downey, CA 90242. John Doe was seventeen years old at all relevant times.

2. Defendant COUNTY OF LOS ANGELES ("COLA") is a legal and political entity, established under the laws of the State of California, with all of the powers specified and necessarily implied by the Constitution and the laws of the State of California and exercised by various government agents and officers. COLA is responsible for the actions, omissions, policies, procedures, practices, and customs of its various agents and agencies, including the Los Angeles County Probation Department and its agents and employees. At all relevant times, COLA was responsible for ensuring that the actions, omissions, policies, procedures, practices, and customs of its employees and agents complied with the laws of the United States and the State of California. At all relevant times, COLA was the employer of each of the individually named defendants, and Los Padrinos was a County-run facility.

3. Defendant LOS ANGELES COUNTY PROBATION DEPARTMENT ("LACPD") is a department of the County and is responsible for the custody, care, and supervision of youth in juvenile detention facilities.

4. At the times relevant hereto, Defendant Los Angeles County Chief Probation Officer GUILLERMO VIERA ROSA ("CHIEF VIERA ROSA") was the Chief Probation Officer for the County of Los Angeles and is sued in his official capacity. At all relevant times, LACPD and CHIEF VIERA ROSA were responsible for ensuring that the actions, omissions, policies, procedures, practices, and customs of its employees and agents complied with the laws of the United States and the State of California. LACPD was the County agency responsible for operating Los Padrinos.

5. On information and belief, CHIEF VIERA ROSA was appointed Interim Chief Probation Officer in May 2023, when the BSCC again declared Barry J. Nidorf and Central Juvenile Halls unsuitable and the County moved hundreds of youth to Los Padrinos. Thereafter, CHIEF VIERA ROSA was notified of the BSCC findings and the deficiencies described above at every Probation Oversight Commission meeting and in the other oversight proceedings that followed, including the BSCC's October 2024 determination that Los Padrinos was unsuitable for juvenile confinement and the BSCC Board's April 2025 decision upholding it. Plaintiff alleges, on information and belief, that CHIEF VIERA ROSA therefore knew of the staffing, supervision, use-of-force, falsified-records, and reporting deficiencies, and knew that youth at Los Padrinos faced a substantial risk of forced fights, sexual abuse, and coercion. CHIEF VIERA ROSA was deliberately indifferent to that risk. With that knowledge, he failed to correct the conditions, failed to implement the corrective action plan that the BSCC rejected, pursued an appeal that delayed the facility's depopulation, and continued to house youth at Los Padrinos.

6. Defendant ANGELICA CHICAS was at all relevant times a female custodial officer, probation officer, detention officer, guard, employee, agent, and/or representative of the County and/or LACPD assigned to, working at, or exercising authority over youth at Los Padrinos. Plaintiff is informed and believes, and thereon alleges, that ANGELICA CHICAS participated in, directed, enabled, failed to intervene in, covered up, ratified, or otherwise contributed to sexual abuse, sexual harassment, invasion of bodily privacy, improper viewing, improper search conduct, humiliation, retaliation, and/or related misconduct against Plaintiff while he

was a minor in custody. ANGELICA CHICAS is sued in her individual capacity and, to the extent applicable, official capacity.

7. Defendant HEIDI DOE, last name presently unknown ("HEIDI DOE"), is, on information and belief, a female employee of the Los Angeles County Department of Mental Health ("DMH") who was assigned to, provided services at, or otherwise worked at Los Padrinos Juvenile Hall ("Los Padrinos") during Plaintiff's detention there. Plaintiff knows HEIDI DOE by her first name, "Heidi," and identifies her by that name, by her employer, DMH, and by her place of work, Los Padrinos. At all relevant times, HEIDI DOE was a mandated reporter of child abuse and neglect under California Penal Code section 11165.7. Plaintiff reported the sexual abuse he was suffering at Los Padrinos to HEIDI DOE. Plaintiff is informed and believes, and thereon alleges, that HEIDI DOE failed to make the report required by law, failed to take any action in response to Plaintiff's report, and failed to intervene to protect Plaintiff from continued abuse. HEIDI DOE is sued in her individual capacity and, to the extent applicable, official capacity.

8. Plaintiff does not presently know HEIDI DOE's full name. HEIDI DOE is a real, identifiable individual: a DMH employee who worked at Los Padrinos during Plaintiff's detention and who personally received Plaintiff's report of sexual abuse. Plaintiff alleges, on information and belief, that DMH and the County of Los Angeles maintain staffing, assignment, and records sufficient to identify HEIDI DOE, and that the true name of HEIDI DOE is within their possession. Plaintiff will amend this Complaint to state HEIDI DOE's true name when it is ascertained. Plaintiff is entitled to identify HEIDI DOE through discovery. (Code Civ. Proc., § 474.)

9. Plaintiff is further informed and believes that additional female guards, custodial officers, probation staff, search-team members, supervisors, and/or Doe defendants participated in, witnessed, enabled, failed to intervene in, failed to report, covered up, or ratified similar misconduct. Plaintiff expressly reserves the right to amend this pleading to identify and name additional female guards and other responsible personnel once their identities are confirmed through discovery, video review, duty rosters, shift logs, personnel records, PREA records, incident reports, PMK testimony, and/or other evidence.

10. The true names of defendants Does 1 through 100 are presently unknown to Plaintiff, who therefore sues each of these defendants by such fictitious name; but upon ascertaining the true identity of a defendant Doe, Plaintiff will amend this complaint or seek leave to do so by inserting the true and correct name in lieu of the fictitious name. Plaintiff is informed and believes, and on the basis of such information and belief, alleges that each defendant Doe herein is in some manner responsible for the injuries and damages alleged herein.

11. All individually named Doe defendant are individuals and/or entities employed by or acting on behalf of the County or Probation Department and are responsible in some manner for the acts and omissions alleged herein, like each individually named defendant, acted under color of law and within the scope of their agency and employment with the County and LACPD. Each Doe is sued in both their official and individual capacities.

12. Defendants ANGELICA CHICAS, HEIDI DOE, CHIEF VIERA ROSA, and DOES 1–100 are referred to collectively as the “Individual Defendants.” DOES 1–40 are alleged to be supervisory or policymaking

personnel. DOES 41–100 are alleged to be custodial, medical, or other line staff. Plaintiff will identify the Doe Defendants by name through discovery and will amend this Complaint accordingly.

## II. JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 as Plaintiff asserts causes of action arising under 42 U.S.C. § 1983 for violation of his constitutional rights. The Court has supplemental jurisdiction over the corresponding state-law claims pursuant to 28 U.S.C. § 1367.

14. Venue is proper in this District under 28 U.S.C. § 1391(b), as the events giving rise to this action occurred in Los Angeles County, California, within the Central District of California.

15. With respect to the state-law causes of action, Plaintiff has complied with the requirements of the California Government Claims Act. Plaintiff presented a government tort claim to the County of Los Angeles on April 17, 2025, and the County rejected the claim on May 22, 2025. See Cal Gov't Code §§ 900 et seq.

## III. GENERAL BACKGROUND

16. Under California law, juvenile halls exist solely for the purpose of rehabilitation and not punishment. California requires juvenile detention facilities to provide "safe and supportive homelike environments[s]" that are not treated as "penal institution[s]," (Welfare and Institutions Code §851).

17. This civil rights action arises from Los Angeles County's longstanding, well-documented, and systemic failure to protect children in its juvenile probation facilities from abuse, neglect, coercion, and unconstitutional conditions of confinement. For decades, Los Angeles County, through its Probation Department and Juvenile Court system, has

knowingly maintained facilities where children are subjected to violence, denied basic care, and held in punitive and degrading environments that violate federal and state law.

18. Rather than protect vulnerable youth, the County has tolerated and enabled a culture of fear and violence, where probation officers regularly use excessive force, facilitate youth-on-youth assaults, coerce silence through threats and retaliation, and neglect the mental and physical health needs of the children in their care.

19. Los Angeles County operates the most extensive juvenile probation system in the United States, managing multiple youth detention facilities and camps, including Los Padrinos Juvenile Hall. These facilities are operated under the authority of the Los Angeles County Probation Department.

20. Detention staff regularly fail to intervene in fights, ignore threats of violence, or directly instigate confrontations between detained youth, a practice that observers have compared to “gladiator fights.”

21. Sexual abuse has also been widespread. In 2023, the California DOJ and BSCC found numerous violations of the federal Prison Rape Elimination Act (PREA) in LA County juvenile facilities, including poor supervision, lack of reporting protocols, and credible allegations of staff-perpetrated sexual misconduct, disproportionately involving vulnerable Black male youth.

22. Despite repeatedly being put on notice through state inspections, lawsuits, grand jury reports, and oversight hearings, Los Angeles County has failed to take reasonable steps to eliminate racially discriminatory practices or protect youth from physical, emotional, psychological, and sexual violence.

23. Oversight agencies at every level have recognized Los Angeles County's persistent failure to address unlawful and inhumane conditions in the juvenile halls, including the United States Department of Justice, California Attorney General, the Los Angeles Office of the Inspector General, the Los Angeles County Department of Mental Health, the Probation Oversight Commission (POC), and the California Board of State and Community Corrections (BSCC).

24. Plaintiffs bring this action to hold the County accountable for its deliberate indifference to the health and safety of youth in its custody. Despite over 100 years of notice from federal investigations, state oversight bodies, lawsuits, media exposés, whistleblower complaints, and its internal reports, Los Angeles County has failed to take meaningful, lasting steps to address the endemic abuse, staff misconduct, and dangerous conditions in its juvenile halls and camps.

**The History of Los Angeles's Juvenile Detention Facilities**

25. Persistent scandals, mismanagement, and institutional failures have plagued Los Angeles County's juvenile probation system. From excessive force and unsanitary conditions to staff misconduct and state noncompliance, the county's facilities have become emblematic of a system in deep crisis.

26. In 1890, the California State Legislature established the state's first correctional institutions for youth. They are referred to as "reform schools." In 1891, the first such reform school, the Whittier State Reformatory for Boys and Girls, opened. (Daniel Macallair, Grecia Reesendez & Maureen Washburn, Beyond Repair: Envisioning a Humane Future After 132 Years of Brutality in California's Youth Prisons, Ctr. on Juvenile & Crim. Just., at 6–7 (June 2023).) In 1903, the first California

probation laws were enacted, and Captain Augustus C. Dodds was appointed the first Los Angeles County Chief Probation Officer. In 1912, A Permanent juvenile detention facility opened on Eastlake Avenue in Los Angeles, the present site of Central Juvenile Hall. The New County Charter named the Probation Officer as an administrative officer of the County, and all employees came under the merit system. (Los Angeles Cnty. Probation Dep't, History of the Department, Probation (last visited June 11, 2025), https://probation.lacounty.gov/history/.)

27. In 1914, the state inflicted forced sterilization on poor, primarily non-white youth. In 1919, El Retiro School for Girls was established in Sylmar under the direction of the Probation Committee, which the Board of Supervisors now appoints. In 1920, the Probation staff had grown to 27 Deputy Probation Officers, who handled 1,893 Juvenile Court petitions and 690 adult cases each month. In 1928, the department opened its first branch office in Long Beach. In 1935, the second branch area office opened in Pasadena. In 1938, probation services were made available to the Los Angeles Municipal Courts. (Los Angeles Cnty. Probation Dep't, History of the Department, Probation (last visited June 11, 2025), https://probation.lacounty.gov/history/.)

28. In 1939, the suspicious suicide of a 13-year-old boy amid widespread abuse and mistreatment prompted a state investigation. In 1942, the state reorganized its youth facilities by moving them from the Division of Institutions into a new entity, the California Youth Authority (CYA). (Daniel Macallair, Grecia Reesendez & Maureen Washburn, Beyond Repair: Envisioning a Humane Future After 132 Years of Brutality in California's Youth Prisons, Ctr. on Juvenile & Crim. Just., at 6–7 (June 2023).)

29. In 1957, Los Padrinos, the second juvenile hall, opened, and the direction of juvenile halls was transferred from the Probation Committee to the Probation Department. In 1960, the Los Angeles County Department underwent a reorganization into new divisional lines, creating Field Services, Juvenile Facilities, Administrative Services, and a Medical Division, with a total staff of 2,200. Five hundred Deputy Probation Officers in Field Services investigated 25,000 adult and 16,500 juvenile cases each year and supervised 24,500 adult and 15,000 juvenile probationers from 11 area offices. One hundred deputies worked with almost 1,000 boys in 10 camps. There were two juvenile halls and one girls' school. In 1965, San Fernando Valley Juvenile Hall opened to provide service to the northeast area of the County and relieve overcrowding at other detention facilities. The total department staff exceeded 3,300 employees working in 13 area offices, four specialized offices, 14 camps and schools, and four juvenile detention facilities. (Los Angeles Cnty. Probation Dep't, History of the Department, Probation (last visited June 11, 2025), https://probation.lacounty.gov/history/.)

30. In 1970, the Los Angeles County Probation Department was among the "national leaders" in the field of corrections. Almost half of its 4,400 employees were professional Deputy Probation Officers. More than 16,000 juveniles and 53,000 adults were under the guidance, supervision, and care of staff working in 40 locations, including area offices, sub-offices, specialized programs, detention facilities, camps, schools, community day care centers, and aftercare units. In 1975, McLaren Hall in El Monte was transferred to DPSS, and the new Las Palmas School for Girls replaced the old El Retiro School. In 1976, Las Palmas School for Girls was renamed

Dorothy Kirby Center in honor of the woman who founded it and served as its Director for 15 years. (Id.)

31. In 1980, the probation staff consisted of 3,972 employees working throughout the county in 40 different work locations. In 1983, the Department had 3,204 employees, and more than half of these were Deputy Probation Officers, working in 40 locations. In 1985, a staff of 3,444 employees was working throughout the County in 46 work locations. (Id.)

32. In 1982-1988, the Commonweal Research Institute released a series of reports condemning CYA's abusive practices. In 1996, CYA's population reached its peak, exceeding 10,000 youth. (Daniel Macallair, Grecia Reesendez & Maureen Washburn, Beyond Repair: Envisioning a Humane Future After 132 Years of Brutality in California's Youth Prisons, Ctr. on Juvenile & Crim. Just., at 6–7 (June 2023).) In 1999, Staff were found to be punishing youth by denying them food and handcuffing them around the clock. Scandal erupts when the public learns of staff organizing fights between youth in what was referred to as "Friday Night Fights." (Id.)

33. In 2000, A female youth sued, alleging she was repeatedly molested by staff. An inspector finds that staff keep some youth in their cells for 23 hours a day. In 2003, A youth commits suicide, the 13th since 1996, and the Prison Law Office sues CYA over poor conditions and rampant violence. In 2004, CYA was placed under a consent decree, which brought routine monitoring and court oversight. Additionally, CJCJ (Center on Juvenile and Criminal Justice) staff testified on the harms of CYA before the State Legislature. In 2005, CJCJ hosts the Restructuring Youth Corrections in California conference and submits a blueprint to the California State Legislature on creating a more humane juvenile justice system and the state reorganizes again, dissolving the CYA and placing its

facilities within DJJ, a division of the California Department of Corrections and Rehabilitation, which administers adult prisons. (Id.)

34. In 2006, the U.S. Department of Justice (DOJ) began investigating conditions at the County's juvenile camps 2006 after repeated reports of abuses. (U.S. Dep't of Justice, Civil Rights Div., Findings Letter to the County of Los Angeles Regarding Youth Camps and Ranches (Oct. 31, 2008), https://www.justice.gov/sites/default/files/crt/legacy/2010/12/15/lacamps_findings_10-31-08.pdf (last visited June 11, 2025).) In 2007, A new law (SB 81) required that counties commit most youth to county facilities rather than the DJJ (Daniel Macallair, Grecia Reesendez & Maureen Washburn, Beyond Repair: Envisioning a Humane Future After 132 Years of Brutality in California's Youth Prisons, Ctr. on Juvenile & Crim. Just., at 6–7 (June 2023).)

35. In 2008, the DOJ concluded that Los Angeles County was violating the constitutional rights of young people in detention at various facilities, including juvenile probation camps and detention centers. This was due to issues like excessive use of force, violent conditions, and inadequate access to mental health resources and rehabilitative programming. As a result of these findings, the county entered into an agreement with the DOJ in 2008 to resolve the issues and implement reforms. This led to seven years of court oversight. The DOJ's investigation and subsequent agreement addressed issues such as the failure to protect youth from harm by staff (including excessive force and inappropriate use of pepper spray), failure to protect youth from harm by other youth, inadequate staffing and training, and inadequate investigation of abuse allegations. (U.S. Dep't of Justice, Civil Rights Div., Findings Letter to the County of Los Angeles Regarding Youth Camps and Ranches (Oct. 31,

2008), https://www.justice.gov/sites/default/files/crt/legacy/2010/12/15/lacamps_findings_10-31-08.pdf (last visited June 11, 2025).)

36. The use of OC (oleoresin capsicum) spray, commonly known as pepper spray, in juvenile halls remained a significant issue through the 2010s, with staff routinely deploying it despite calls from medical experts and civil rights groups to ban its use. Youth subjected to spray reported trauma and respiratory distress, and LA County continually delayed promised phase-outs.

37. In 2011, Governor Jerry Brown signed Assembly Bill 109, the California State Public Safety Realignment Plan. This plan shifted the supervision of individuals who were convicted of non-violent, non-serious, non-high risk sexual offenses from the State Parole's jurisdiction to the local county probation departments throughout the state. Between September and November, the Department received approximately 4,000 former parolees for supervision services. (Daniel Macallair, Grecia Reesendez & Maureen Washburn, Beyond Repair: Envisioning a Humane Future After 132 Years of Brutality in California's Youth Prisons, Ctr. on Juvenile & Crim. Just., at 6–7 (June 2023).)

38. In 2016, the DJJ was released from the Farrell lawsuit, ending routine monitoring of the facilities. (Id.) In 2017, investigations into "voluntary probation" programs revealed that thousands of students, many of whom had committed no criminal offenses, were placed under supervision. This punitive model disproportionately targeted students of color and diverted funds from community-based supports to probation officer salaries. (Lauren Lee White, Why Are L.A. High Schoolers Getting Probation Without Committing a Crime?, LA Weekly (July 14, 2017).)

39. In 2019, the Los Angeles County Office of the Inspector General (OIG) issued a report addressing the increase in pepper spray deployment within the juvenile halls. CJH had approximately 267 chemical force incidents in 2017 and 232 in 2018. BJN had 174 documented chemical force incidents in 2017 and 161 in 2018. The OIG reported that probation staff used pepper spray as a tool to gain compliance from youth. Based on use-of-force data from the 2017 – 2018 In calendar years, the OIG found that probation staff consistently used pepper spray as an initial or intermediary force option rather than de-escalation strategies. The OIG also reported that staff regularly failed to issue warnings to youth immediately before using pepper spray. Some staff threatened the use of pepper spray as an initial effort to gain compliance, before giving verbal commands.

40. In 2019, the CJCJ released a scathing account of life inside DJJ facilities since the end of the Farrell lawsuit, detailing staff abuse and a culture of violence. In February 2019, the County Board of Supervisors followed the vast majority of states, and voted to phase out the use of OC spray ("pepper spray") in the juvenile halls based on a well-documented history of excessive and unlawful application of pepper spray against youth, including routine use of pepper spray for minor offenses. Despite the vote to phase out OC Spray, the Board of Supervisors has not provided full funding for the plan, and many of the proposed changes have not been implemented. (Los Angeles Cnty. Auditor-Controller, Probation Department – Juvenile Institution Cost Savings Review (Report # K20GU) – First and Final Follow-Up Review (June 9, 2020, Board Agenda Item 10) (June 9, 2020),
https://file.lacounty.gov/SDSInter/auditor/audit_reports/1082037_2020-12-

3ProbationDepartment_JuvenileInstitutionCostSavingsReview_June9_2020_BoardAgendaItem10_.pdf (last visited June 11, 2025).)

41. In 2020, Governor Gavin Newsom, recognizing its long history of failure and harm, proposed closing DJJ. SB 823 (2020) and SB 92 (2021) outline the shift to an entirely county-based system. (Daniel Macallair, Grecia Reesendez & Maureen Washburn, Beyond Repair: Envisioning a Humane Future After 132 Years of Brutality in California's Youth Prisons, Ctr. on Juvenile & Crim. Just., at 6–7 (June 2023).) State realignment, as outlined in Senate Bill 823, transferred responsibility for serious youth offenders from the state Department of Juvenile Justice (DJJ) facilities to county systems. LA County's inability to meet this new obligation became evident as it struggled to provide secure and rehabilitative environments under the Secure Youth Treatment Facility (SYTF) designation.

42. In 2021, Dr. Adolfo Gonzales was appointed Chief Probation Officer for the County of Los Angeles, overseeing the nation's largest Probation Department, which has an annual budget of over $1 billion and employs 5,671 positions. (Los Angeles Cnty. Probation Dep't, History of the Department, Probation (last visited June 11, 2025), https://probation.lacounty.gov/history/.) Amid escalating concerns, Los Angeles County and the County Office of Education entered into a 2021 settlement agreement with the California Department of Justice to address unlawful conditions and inadequate education in juvenile detention. The stipulated judgment required systemic reforms, including better programming, healthcare, and conditions of confinement. (Cal. Att'y Gen. Xavier Becerra, Attorney General Becerra, Los Angeles County Enter into Groundbreaking Settlements to Protect the Rights of Youth in the Juvenile

Justice System (Jan. 13, 2021), https://oag.ca.gov/news/press-releases/attorney-general-becerra-los-angeles-county-enter-groundbreaking-settlements (last visited June 11, 2025).)

43. Meanwhile, repeated inspections by the Board of State and Community Corrections (BSCC) found Barry J. Nidorf and Central Juvenile Hall noncompliant in key areas, including safety checks, room confinement, and programming. In October 2021, both were formally deemed unsuitable for youth confinement under California law. (Cal. Bd. of State & Cmty. Corrs., BSCC Finds L.A. Juvenile Halls Unsuitable for Confinement of Minors (Sept. 18, 2021), https://www.bscc.ca.gov/news/bscc-finds-la-juvenile-halls-unsuitable-for-confinement-of-minors/ (last visited June 11, 2025).)

44. In response, the county attempted to avoid scrutiny by transferring youth from Central to Barry J. Nidorf before scheduled inspections. (Alene Tchekmedyian, L.A. County's Juvenile Halls Deemed Unsuitable for Youths by State Regulators, L.A. Times (May 23, 2023), https://www.latimes.com/california/story/2023-05-23/la-county-juvenile-halls-unsuitable.) This maneuver only temporarily delayed state enforcement actions, as both facilities continued to fail inspections well into 2023.

45. In December 2022, over 300 women filed a lawsuit against the county, alleging they had been sexually abused while incarcerated as juveniles in county-run facilities. (James Queally, More than 300 Women Say They Were Abused in L.A. Juvenile Facilities. Their Lawsuit Could Be Just the Start, L.A. Times (Dec. 6, 2022), https://www.latimes.com/california/story/2022-12-06/abuse-lawsuit-los-

angeles-county-juvenile-halls.) This multi-generational abuse lawsuit emphasized the deep-rooted culture of impunity within the probation system.

46. Facility instability continued into 2023. Probation Chief Adolfo Gonzales was terminated by the Board of Supervisors, and the California Department of Justice (DOJ) filed a motion to enforce the 2021 stipulated judgment after finding ongoing illegal conditions in juvenile halls. (Senate Budget & Fiscal Review Subcomm. No. 3 on Health & Human Services & Subcomm. No. 5 on Corrections, Public Safety, Judiciary, Labor & Transportation, Final Agenda for Joint Hearing on Juvenile Justice Realignment 8–10 (Feb. 14, 2024), https://sbud.senate.ca.gov/sites/sbud.senate.ca.gov/files/Final.%20Agenda%20Sub3.%20Sub5%20Juvenile%20Justice%20Hearing%2002.14.2024.pdf.)

47. In May 2023, Guillermo Viera Rosa was appointed Interim Chief, and the BSCC again declared Barry J. Nidorf and Central Juvenile Halls unsuitable, ordering the relocation of hundreds of youths. The county moved all youth to Los Padrinos Juvenile Hall, a previously closed facility that reopened in July 2023 with 274 youth. (Id.)

48. The reopening of Los Padrinos quickly became a disaster. Within months, the BSCC found 22 areas of noncompliance between Los Padrinos and Barry J. Nidorf. These included inadequate staffing, failure to conduct regular safety checks, and improper use of restraints. (Id.)

49. Meanwhile, staffing woes worsened. The department suspended dozens of probation officers for failing to report to work, while others were under investigation for misconduct, including sexual abuse of

youth in custody. The resulting understaffing created a dangerous and chaotic environment.

50. In February 2024, the BSCC declared Los Padrinos Juvenile Hall unsuitable in twelve separate regulatory areas. These included violations of standards related to staffing, youth supervision, and excessive confinement in rooms. Simultaneously, Barry J. Nidorf SYTF was found unsuitable in ten areas, including education programs, staffing, and safety checks. (Los Angeles County Probation Oversight Commission, Timeline: Juvenile Justice in Crisis (Jan. 2024), https://file.lacounty.gov/SDSInter/bos/commissionpublications/internal/1158743_Timeline.pdf.)

51. In August 2024, the BSCC issued a formal notice of noncompliance, stating that Los Padrinos violated Title 15, Section 1321, regarding staffing requirements. (Id.) This failure reflected chronic problems hiring and retaining qualified personnel, a theme that persisted throughout 2024.

52. In October 2024, the BSCC officially declared Los Padrinos unsuitable for juvenile confinement after rejecting the county's Corrective Action Plan (CAP). (Id.) The plan was faulted for lacking details on how the county would remedy staffing shortfalls, implement service safeguards, and establish clear timelines for compliance. The county was given until December 12, 2024, to resolve the deficiencies.

53. From December 5 to 6, 2024, the BSCC conducted a follow-up inspection at Los Padrinos at the request of the Probation Department. The inspection confirmed that the facility remained noncompliant with key regulatory standards. (Id.)

54. On December 11, 2024, the Probation Department submitted a formal notice of appeal contesting the BSCC's findings of unsuitability. The appeal was part of the department's continued effort to delay mandated depopulation of the facility. (Id.)

55. These administrative proceedings culminated in April 2025, when the BSCC Board unanimously upheld the findings of unsuitability and denied the county's appeal. The Board reaffirmed that Los Padrinos violated multiple standards beyond staffing, including regulations related to room confinement, use of force, use of restraints, discipline procedures, and clothing provisions. (Id.)

56. In conjunction with regulatory issues, systemic abuse persisted. In March 2025, 30 probation officers were indicted for orchestrating "gladiator fights" among incarcerated youth. (Alene Tchekmedyian, 30 L.A. County Probation Officers Indicted in "Gladiator Fights" Scandal, L.A. Times (Mar. 12, 2025), https://www.latimes.com/california/story/2025-03-12/la-county-probation-officers-gladiator-fights-indictment.) This scandal centered on Los Padrinos and revealed a deeply ingrained culture of dehumanization within the department.

57. These issues were far from isolated. Earlier in the crisis, a 2023 overdose at Barry J. Nidorf Juvenile Hall exposed dangerous lapses in contraband control and youth supervision. A 17-year-old died after ingesting fentanyl in his room, raising alarm about staff shortages and neglect. (Senate Budget & Fiscal Review Subcomm. No. 3 on Health & Human Services & Subcomm. No. 5 on Corrections, Public Safety, Judiciary, Labor & Transportation, Final Agenda for Joint Hearing on Juvenile Justice Realignment 8–10 (Feb. 14, 2024), https://sbud.senate.ca.gov/sites/sbud.senate.ca.gov/files/Final.%20Agenda

%20Sub3.%20Sub5%20Juvenile%20Justice%20Hearing %2002.14.2024.pdf.)

58. The department's internal challenges were compounded by external litigation. In 2024, the county reached a $30 million class-action settlement over allegations that youth had been denied access to restrooms, forced to defecate in containers, and held in squalid conditions. (Los Angeles County Claims Board Recommendation (Dec. 17, 2024), https://file.lacounty.gov/SDSInter/bos/supdocs/198121.pdf.)

59. Meanwhile, BSCC inspections throughout 2024 found repeated instances of falsified records, untrained staff, and excessive force. Inspectors noted that youth often lacked access to education, medical care, and recreation, standards mandated under both state law and the DOJ agreement. (Los Angeles County Probation Oversight Commission, Timeline: Juvenile Justice in Crisis ( Jan. 2024 ) , https://file.lacounty.gov/SDSInter/bos/commissionpublications/internal/1158743_Timeline.pdf.)

60. Despite these crises, the county's reform initiative "Youth Justice Reimagined" remained underutilized. A 2024 audit revealed that only 11% of the $88 million in allocated state funds had been spent, further underscoring bureaucratic inertia and inadequate leadership accountability. (California State Auditor, Los Angeles County: It Has Yet to Spend Tens of Millions of Dollars Intended to Provide Services to Realigned Youth, Report 2023-134, (Aug. 20, 2024), https://www.auditor.ca.gov/reports/2023-134/.)

61. In December 2024, just before the court-imposed deadline, the Probation Department's notice of appeal was rejected. The rejection confirmed that Los Padrinos would have to cease operations and transition its youth to alternate placements. (Los Angeles County Probation Oversight

Commission, Timeline: Juvenile Justice in Crisis (Jan. 2024), https://file.lacounty.gov/SDSInter/bos/commissionpublications/internal/1158743_Timeline.pdf.)

62. These events coincided with a broader reckoning. In 2025, LA County approved a $4 billion settlement to resolve nearly 7,000 sexual abuse claims, making it the largest such payout in U.S. history. The scale of the settlement reflected decades of failure to protect youth in custody, the claims date back to 1959, and primarily alleged abuse from the 1980s to the early 2010s. (City News Service, L.A. County Faces $4 Billion Sex Abuse Settlement Over Juvenile Hall Allegations, NBC Los Angeles (Apr. 2, 2025), https://www.nbclosangeles.com/news/local/la-county-juvenile-hall-sex-abuse-settlement/3348791/.)

63. The culmination of regulatory enforcement, litigation, and criminal charges has made clear that incremental reform is insufficient. The 2021 DOJ stipulated judgment was insufficient to curb the department's systemic failures; enforcement actions were still required into 2025 to ensure compliance.

64. As of May 2025, following Judge Espinoza's final order, Los Padrinos was under a court-mandated depopulation plan. The Probation Department was instructed to develop placement and transportation plans, including specific provisions for youth with developmental disabilities. However, the department's plan only involved the relocation of 100 youth; therefore, youth continue to be subjected to the heinous conditions at Los Padrinos. (James Queally, Judge Orders More Than 100 Youths Moved Out of Troubled L.A. County Juvenile Hall, Los Angeles Times (May 16, 2025, 1:32 PM PT),

https://www.latimes.com/california/story/2025-05-16/los-padrinos-county-juvenile-hall-ruling.)

65. Throughout its existence, Los Angeles County's juvenile probation facilities have been characterized by legal, moral, and operational failures. Despite federal and state intervention, the department has failed to ensure safe, rehabilitative conditions for youth in custody. The cumulative weight of lawsuits, indictments, consent decrees, and state sanctions demands not incremental reform, but wholesale structural transformation. In the meantime, children, the most vulnerable of our population, continue to suffer

**B. Life in LA County Juvenile Detention Juvenile Intake**

66. Based on information and belief, upon arriving at Juvenile Hall, youth are placed in an intake unit where they stay for a time ranging from hours to months. Depending on the staff assigned to the intake unit, Youth may be forced to strip naked and take a shower while a probation officer watches them or be subjected to an invasive cavity search. If youth are lucky, they will receive hygiene products, sheets, and clean clothes. Many youth never receive a pillow or a blanket. The violation of Youths rights begins as soon as they walk in the door. (Welfare and Institutions Code § 224.71 states that Youth have a right "(a) To live in a safe, healthy, and clean environment conducive to treatment, positive youth development, and healing and where they are treated with dignity and respect." And that youth have a right "(c) To receive adequate and healthy meals and snacks, clean water at any time, timely access to toilets, access to daily showers, sufficient personal hygiene items, clean bedding, and clean clothing in good repair, including clean undergarments on a daily basis, and new underwear that fits. Clothing, grooming, and hygiene products shall be

adequate and respect the child's culture, ethnicity, and gender identity and expression.")

67. Eventually, youths are assigned to a long-term unit. Despite staff's awareness of the volatility of neighborhood gang rivalries, youth are assigned to units based on age and offense, resulting in many youth being placed in close quarters with their "enemies."

**Los Padrinos Sanctioned Gladiator Fights**

68. Based on information and belief, after being assigned to their long-term unit, the youth will receive a visit from another youth detainee who will inform them of the number of "fades" that the youth has. "Fades" are fights that the youth are forced to participate in by the staff. Generally, the initial fights are against other incarcerated youth who are from rival neighborhoods or a different racial group, the youth's "enemies". However, sometimes the probation officers will force the youth to fight other youth they are friendly and familiar with, just because. To justify such brutality, the Staff explain to kids that these fights are to decrease testosterone and tension. In reality, the initial fights on the first day are used by staff to evaluate the youth's prowess and fighting skills. Youth who prove to be strong fighters are rewarded with chips or candy and eventually the opportunity to become "KP," a coveted position that affords youths special privileges, such as running the phones and receiving extra food.

69. KPs are used by staff as enforcers. If they are having issues with a youth or are displeased with a youth's behavior, they will have the KP beat them up or order the KP to organize for the youth to be "jumped," which is when multiple youth beat up one youth.

70. The forced participation in fights orchestrated by probation officers serves no legitimate purpose. Instead, the underlying motives

behind such conduct reveal a pattern of abuse, dehumanization, and systemic corruption within juvenile detention facilities. For probation staff, these fights serve as a form of illicit entertainment, sometimes involving bets or the offer of food, privileges, or protection as incentives for the best fighters. Probation officers derive personal amusement and sadistic pleasure from watching vulnerable youth physically harm one another.

71. Forcing youth to fight allows officers to reinforce an authoritarian power dynamic and demonstrate absolute control over detainees. By manipulating interpersonal conflicts or creating new ones, probation officers assert dominance and foster an atmosphere of fear and obedience, deterring youth from resisting institutional authority. Officers exploit racial, gang, or personal tensions to sow division, preventing youth from organizing or collectively resisting systemic abuses.

72. Youth who report abuse, refuse orders, or otherwise challenge staff authority may be punished by being forced into fights as a form of retaliation. This tactic intimidates others and coerces silence, reinforcing a culture of fear and impunity within the facility. If a youth refuses to engage in the fights, staff may lock them in their rooms, deny them meals, take away their phone calls, and sometimes arrange for a group of other youth to attack them. (Video Shows L.A. Probation Officers Letting Group Beat Teen in Los Padrinos Juvenile Hall, L.A. Times(Apr. 12, 2024), https://www.latimes.com/california/story/2024-04-12/video-shows-l-a-probation-officers-letting-group-beat-teen-in-los-padrinos-juvenile-hall (officers “stood by watching,” “laughed,” and “shook hands” while a teen was beaten)) By fostering and allowing the violent conditions, officers construct false narratives to justify the need for harsher security measures.

73. The persistence of staff-facilitated “gladiator fights” inside juvenile centers, knowing such actions are on camera, exposes not only systemic impunity but also a disturbing layer of exploitation and entertainment culture within state custody. In some cases, fights are rewatched, recorded, or even distributed on social media, indicating motivations that go beyond mere control. In theory, camera systems are installed to enhance safety, deter misconduct, and provide accountability. But in practice, their presence has failed to prevent staff from organizing or allowing youth fights. Staff are either unafraid of consequences or actively protected by their superiors. Surveillance footage is often ignored, erased, or manipulated. Supervisors review footage selectively or with willful blindness. Reporting mechanisms are ineffective, retaliatory, or deliberately obstructed.

74. The fact that youth are being pitted against one another on camera, sometimes while staff are visibly present, demonstrates that visibility alone does not equal accountability in a system where misconduct is tolerated or normalized. The existence of camera footage is no longer a deterrent; instead, it has become part of a closed system of abuse, where harm is documented yet unpunished, further traumatizing youth and emboldening staff.

75. Violence has become a recreational spectacle for those in power, reinforcing dominance and normalizing brutality. This conduct has transformed juvenile halls from a place of supposed rehabilitation into a controlled environment of state-enabled violence, voyeurism, and coercion, where the tools of oversight are repurposed for abuse.

**Pepper Spray**

76. "Pepper spray, or Oleoresin Capsicum (O.C.) spray, is made from capsaicinoids (Santa Clara County Juvenile Justice Commission. 2014. Use of Oleoresin Capsicum (OC) spray in juvenile hall. San Jose, California. https://www.sccgov.org/sites/bhd/info/MentalHealthBoard/BHB/Documents/2015/BHB-Apr-handouts/ReportOnOCSpray.pdf) taken from the resin of chili peppers. (British Columbia Drug and Poison Information Centre. 2010. Pepper Spray and Chili Peppers. Vancouver, British Columbia. http://www.dpic.org/faq/pepper-spray-and-chili-peppers) Based on information and belief, an alternative form of punishment to gladiator fighting is the use of pepper spray. The use of pepper spray (OC spray) by probation officers in juvenile detention facilities such as Los Padrinos Juvenile Hall is not only widespread, it is often accompanied by a deliberate denial of medical care and decontamination, used to further degrade, punish, and control incarcerated youth. (California Board of State and Community Corrections, Los Padrinos Juvenile Hall Unsuitability Findings Report, at 18–19 (Apr. 9, 2025), https://www.bscc.ca.gov/wp-content/uploads/LosPadrinosUnsuitabilityFindings2024.pdf.) These practices compound the already unconstitutional nature of chemical force and reflect systemic abuse within these institutions. "In both 2004 and 2008, the U.S. Department of Justice cited Los Angeles County's juvenile probation department due to "excessive and inappropriate use of pepper spray on youth" (Loudenback, J. 2018. After feds leave, pepper spray use skyrockets again in L.A.'s juvenile justice system. The Chronicle of Social Change. https://chronicleofsocialchange.org/news-2/after-feds-leave-pepper-spray-use-skyrockets-again-in-l-a-s-juvenile-justice-system) Pepper

spray is regularly used on youth, not in response to immediate threats, but for minor rule violations or verbal defiance, or as a response to fights often instigated or manipulated by staff when the fight does not go as the staff desired. Worst of all, at times, the pepper spray is used just because the staff can. Reinforcing that youth are never safe from random acts of violence. "Medically, asthma is 40% more prevalent among African Americans than among Caucasians in California," (Chapman, 2013. Asthma in California: a surveillance report. California Department of Public Health, California Breathing. https://www.cdph.ca.gov/Programs/CCDPHP/DEODC/OHB/WRAPP/CDPH%20Document%20Library/Asthma_in_California2013.pdf) making black children particularly vulnerable to severe side effects when exposed to O.C. spray."

**Denial of Decontamination as Additional Punishment**

77. (Welfare and Institutions Code § 224.71 states that Youth have a right "(b) To be free from physical, sexual, emotional, or other abuse, or corporal punishment.") After youth are pepper-sprayed, they are frequently denied timely or adequate decontamination, even though OC spray causes Intense burning of the skin, eyes, and airways; difficulty breathing and panic attacks; and risk of long-term harm, especially when not properly treated.

78. Instead of being taken to showers, provided clean clothing, or given medical attention, many youth report being left in their rooms for hours without ventilation; forced to sit or lie in soiled clothes, intensifying skin exposure; denied showers or eye flushing for prolonged periods; and mocked or taunted by staff during and after the incident.

79. In some cases, staff deliberately lock youth in confined spaces immediately after spraying them, allowing the chemical to linger in the air and prolonging their suffering. Studies, including scientific randomized trials of different treatment regimens, have found that time is the most important factor in reducing the pain from O.C. exposure (Barry, JD., Hennessy, R., McManus, JG. 2008. A randomized controlled trial comparingtreatment regimens for acute pain for topical oleoresin capsaicin (pepper spray) exposure in adult volunteers. US National Library of Medicine. Bethesda, Maryland.)

80. This denial of care is not incidental; it functions as a secondary punishment meant to inflict further pain, instill fear, and break youth resistance.

81. The denial of decontamination turns the use of pepper spray into a form of chemical torture, a calculated effort to dominate and silence incarcerated youth through fear, humiliation, and physical suffering.

**Unsanctioned Disturbances aka "Riots"**

82. When disturbances, commonly labeled as "riots," break out, staff have repeatedly responded by locking themselves in secured offices, effectively abandoning the youth to chaos, violence, and injury. This practice reflects not only a failure in staff preparedness and training but also a profound breach of the duty of care owed to detained minors.

83. By locking themselves away and removing all adult authority from the scene, staff allow physical violence to escalate unchecked, fueling trauma and distrust among minors who feel completely unprotected. In some cases, youth may damage property or try to flee out of desperation or fear, which further inflames the situation and increases charges or discipline against them, despite staff inaction being the root cause.

84. Ultimately, this shows that staff lack adequate training in crisis response, de-escalation, and trauma-informed care, and operate under policies that prioritize self-protection over youth safety. Rather than managing incidents following legal and professional standards, staff behavior reflects a systemic collapse in operational structure, oversight, and care obligations.

**Staff-on-Youth Violence**

85. The use of excessive force by probation staff is a deeply entrenched and troubling practice, contributing to a climate of fear, violence, and trauma for the youth in custody. Reports and testimonies from both current and former detainees reveal a pattern of brutal physical treatment (James Queally, L.A. County Probation Supervisor to Face Charges in Assault of Teen, L.A. Times (July 24, 2023), https://www.latimes.com/california/story/2023-07-24/l-a-probation-officer-charged-with-assault-in-beating-of-teen-revealed-by-times-report (describing how multiple officers "piled on top of the youth" and a supervisor bent the teen's legs backward over his head—acts deemed a "brutal assault on a child")), often under the guise of discipline or control, but frequently amounting to unprovoked and retaliatory assaults. Probation officers have been reported to body slam youth onto concrete floors, metal bed frames, or tables during altercations or even in response to minor noncompliance. These slams are not used as a last resort to subdue violent behavior, but rather as a first response or punishment tactic, often resulting in physical injuries such as bruises, concussions, broken bones, or long-term musculoskeletal damage. Youth have reported being body slammed for talking back, refusing to enter their room, or asking questions perceived as insubordinate.

86. Probation staff have been known to use chokeholds and neck restraints, despite these techniques being hazardous and widely condemned in youth correctional settings. These restraints are often applied with excessive duration or pressure, leading to breathing difficulties, loss of consciousness, and in some cases, head trauma. Chokeholds are usually used in retaliation rather than genuine attempts to de-escalate, especially after a youth attempts to defend themselves verbally or physically from other staff or detainees.

87. Among the female staff, slapping across the face, head, or body is frequently described by youth as a favored method used to humiliate or intimidate. These slaps are not always meant to injure but are instead designed to establish dominance, provoke a reaction, or punish perceived disrespect. When youth react to these slaps—verbally or physically—it often becomes the justification for further violence, isolation, or write-ups.

88. Youth are often tackled by multiple staff members, even when they are already restrained or not physically resisting.

89. In many cases, three or more officers will dog-pile onto a youth, regardless of the youth's size or demeanor, and pin them to the floor, sometimes face-down, in a position that restricts breathing.

90. Tackling is commonly used during planned or orchestrated incidents, including forced fights, where staff are complicit in instigating violence and then over-responding once a youth retaliates.

91. Youth are placed in painful physical restraints for prolonged periods, including wrist locks, arm bars, and prone holds that can restrict breathing.

92. These methods violate established juvenile detention best practices and have been linked to long-term psychological trauma, especially when used on youth with mental health conditions or developmental disabilities.

93. Staff routinely fail to follow state or county de-escalation protocols, opting instead for immediate physical confrontation.

**Black Squad AKA Search Squad**

94. Based on information and belief, The "Search Squad," also known as the "Black Squad," is a controversial and often secretive unit within Los Angeles County's juvenile detention system. The identity of the squad is rotating and unknown. Allegedly composed of officers in black uniforms, this unit is tasked with conducting searches, shakedowns, and internal security operations across juvenile halls and camps. Youth, advocates, and former staff members have described the Black Squad as operating with minimal oversight and instilling fear among detained youth. Reports indicate that this unit engages in aggressive, sometimes retaliatory, conduct—including mass strip searches, cell extractions, and intimidating displays of force, often under the guise of maintaining order or facility security.

95. The Black Squad's practices raise serious legal and ethical concerns, particularly when searches are conducted without cause, used as a form of punishment or humiliation, or involve excessive physical force. California law, including Welfare and Institutions Code § 224.71(f), prohibits searches that serve as harassment, humiliation, or discipline and requires that all searches preserve the dignity and privacy of the youth. Additionally, these practices may violate constitutional rights under the Fourth and Fourteenth Amendments and run afoul of the federal Prison Rape

Elimination Act (PREA), especially where strip or cross-gender searches are improperly conducted. The existence and conduct of the Black Squad exemplify a punitive, militarized approach to juvenile justice in Los Angeles County—an approach that has long drawn criticism for exacerbating trauma, enabling abuse, and violating the rights of youth in custody.

**Room Confinement**

96. Though strictly limited under many state policies and federal guidance, solitary confinement continues to be used excessively as a form of punishment for minor behavioral issues according to reports from youths. Retaliation against youth who report abuse or challenge staff authority. Control during staff shortages or internal disturbances.

97. Due to recurring staffing challenges, during these periods of isolation, staff have reportedly refused to allow youth to use the bathroom, even when cells are not equipped with toilets. As a result, youth are forced to defecate or urinate in rubber gloves, Styrofoam cups, or food containers, or left to relieve themselves directly on the floor of their cells. They are subsequently denied cleaning materials, causing feces and urine to remain in the cell for hours or longer.

98. This treatment is not accidental or unavoidable, but reflects a deliberate denial of humane conditions, often used to humiliate, break down, or punish youth.

**Destruction of Personal Property**

99. It is widely discussed amongst youth that staff destroy youths' personal property, including letters from family, artwork, and personal photos. This also includes revocation of personal hygiene items. This practice is both psychologically abusive and legally problematic, especially when it targets protected communications or sentimental items. The

destruction of personal property by staff, either as a form of retaliation, control, or humiliation, further illustrates the punitive and hostile environment within the facility.

100. Youth report that letters from loved ones are torn up, thrown away, or withheld without explanation. In some cases, officers have ripped up photos of family members or drawings sent by siblings, either during random searches or as retaliation for alleged rule violations. These acts are callous, as communication with family is often a youth's only emotional anchor during detention. And phone calls are regularly withheld by staff. The destruction of such items serves to isolate youth, increase despair, and deepen emotional trauma. The destruction of personal belongings is frequently retaliatory, used by staff as an informal punishment or a way to send a message, if youth are perceived as "disrespectful" or "noncompliant." Examples include tearing up birthday cards, flushing letters down the toilet, throwing out journals, or smashing handmade crafts during inspections.

101. Destroying personal property is not merely an administrative violation; it causes real psychological harm. Youth feel dehumanized and powerless, reinforcing the belief that they have no control over their lives or dignity. It discourages connection with family, reducing external support networks that are crucial to successful rehabilitation and reintegration. These actions frequently trigger or worsen depression, anxiety, PTSD, and behavioral regression, especially for youth with prior trauma or abuse histories.

**Denial of Contact with Attorney**

102. Youths have reported that probation staff delayed or denied access to phones, making it difficult or impossible to call their attorneys. In-

person legal visits have been obstructed by the unavailability of staff to escort youth or by overly restrictive visitation policies. During lockdowns or staff shortages (which have been frequent at Los Padrinos), legal visits and phone calls are often suspended altogether, sometimes for days at a time.

103. Youth and public defenders have alleged that probation staff discouraged youth from requesting legal help, either through verbal intimidation or threats of punishment (such as loss of privileges or room confinement). Some attorneys report being denied meaningful access when attempting to interview clients about abuse or misconduct, raising concerns about obstruction of legal investigations.

104. The Board of State and Community Corrections (BSCC) has noted that inadequate staffing at Los Padrinos has resulted in systemic denial of rights, including the failure to facilitate timely attorney contact. These denials are particularly damaging when youth face disciplinary action or are being held in solitary-like conditions, times when legal access is especially critical.

105. There is no area for youth to conduct private legal calls with their attorney. Despite such space and opportunity being statutorily required. (Welfare and Institutions Code § 224.71 mandates that youth have a right "(h) To make and receive confidential telephone calls, send and receive confidential mail, and have confidential visits with attorneys and their authorized representatives, ombudspersons, including the Division of the Ombudsperson of the Office of Youth and Community Restoration, and other advocates, holders of public office, state and federal court personnel, and legal service organizations.")

**Sexual Harassment in the Showers**

106. The showers at Los Padrinos, where youth are vulnerable, have become a site of frequent sexual harassment: Staff members routinely make inappropriate comments about the youths' bodies, subjecting them to verbal abuse and sexual objectification. Young Black boys report being ogled, catcalled, and taunted about their physical appearances, which compounds feelings of worthlessness and vulnerability. Sexual harassment in these spaces is not only a violation of the youth's right to bodily integrity but also creates a hostile and unsafe environment, furthering the psychological damage already inflicted by detention.

**Flirting, Inappropriate Physical Encounters, and Staff Exploitation**

107. There are reports of staff members engaging in inappropriate physical contact with youth, including flirting and sexual advances, particularly by female staff. Female staff, who have access to youth rooms at night, engage in sexual acts with detained boys. The power dynamics in play are deeply problematic, with youth, especially those most vulnerable, who comply out of fear of retaliation, further complicating any efforts to report the abuse.

108. Despite the presence of cameras in all hallways, these actions constitute clear violations of institutional protocols. The failure of supervisors to prevent, report, or punish such behavior demonstrates a complete breakdown of both ethics and law enforcement within the facility. These sexual acts are not consensual in any meaningful way, as youth in detention are under the control of staff and in no position to consent freely.

109. Racial stereotyping, where black male bodies are hypersexualized or seen as "disposable," makes them more likely to

experience harassment and abuse by both male and female staff. Along with intersectional abuse, in which both their race and gender make them doubly vulnerable to sexual exploitation and violence. An institutional culture that allows these abuses to persist, with Black youth disproportionately victimized while their complaints are often ignored or dismissed. This racialized violence compounds the harm that youth in detention already experience, and when it is ignored or covered up by supervisors, it perpetuates a cycle of systemic abuse.

110. A deeply troubling aspect of the sexual abuse is the fantasizing by staff, particularly female probation staff, about establishing romantic or sexual relationships with juveniles after they are released. This behavior is indicative of a systemic breakdown in ethical standards, severe power imbalances, and an utter disregard for the psychological well-being of the detained youth.

111. Reports and testimonies from both current and former staff, as well as victims, reveal that certain staff members engage in fantasies about forming romantic relationships with youth after they are released from detention. This behavior includes expressing an interest in seeing youth after their release, often in the form of inappropriate comments or gestures; luring youth with promises of affection, attention, or a "better life" once they are no longer in custody, creating a dangerous emotional and psychological bond that manipulates vulnerable youth; Attempting to create a façade of trust or care that goes beyond their professional role, crossing clear boundaries and implying romantic or sexual interest in the youth once they leave the institution.

112. Such actions constitute a perverse abuse of power, particularly troubling because the youth in detention, especially those of lower

socioeconomic backgrounds or facing familial trauma, are in a highly vulnerable state. They may be receptive to these advances, seeing them as a form of care or validation that they might not have received from others in their lives.

113. This type of behavior falls within the grooming process, where staff members, especially those in authority, slowly build manipulative relationships with youth that normalize inappropriate behavior and create emotional dependence. Many of the youth in detention have significant trauma histories, including abandonment, neglect, and sexual abuse. Staff members exploit these vulnerabilities by offering emotional validation or affection under the guise of kindness or mentorship. These forms of manipulation are incredibly harmful, as they undermine the juvenile's ability to form healthy, non-exploitative relationships post-release and perpetuate a cycle of abuse and exploitation.

114. The most dangerous aspect of these fantasies is the unequal power dynamic between staff and the detained youth. The staff members control access to resources, including housing, food, and basic security within the detention facility. Youth in these circumstances are especially vulnerable to manipulation because of their limited access to choice and autonomy. Further, they have authority over the youth, including the ability to influence their daily lives through punishment, reward, and emotional engagement, making any notion of "romantic interest" not only inappropriate but also a form of psychological coercion.

115. This coercive control can manifest in ways such as Retaliation against the youth who resist or reject inappropriate advances, which can range from verbal punishment to increased isolation or physical restraint. Threats to withhold privileges or extend their time in detention unless the

youth complies with demands, often disguised as an offer of "friendship" or "support" once released.

116. Moreover, youth are often preyed upon during moments of instability or vulnerability, when they are isolated in detention facilities, away from family and support networks. The prospect of a "romantic" relationship with an authority figure can distort the juvenile’s understanding of healthy relationships and consent.

**Cavity Searches**

117. Numerous Youth have reported that strip searches or cavity searches are used as a retaliatory measure; they serve no legitimate correctional purpose. Instead, they are designed to humiliate, intimidate, and control detainees: youth may be subjected to strip searches or cavity searches after an altercation, some of which are orchestrated by staff. The emotional and psychological harm caused by these types of searches is significant.

118. For many youth, strip searches and cavity searches can be deeply humiliating experiences that further compound existing trauma, especially for those who have experienced abuse or neglect before detention. The loss of bodily autonomy and the invasion of privacy inherent in these searches create lasting emotional scars that can have long-term effects on mental health. Youth who undergo retaliatory searches often experience heightened levels of stress, anxiety, and fear. They may develop symptoms of post-traumatic stress disorder (PTSD), particularly if they are subjected to these searches frequently or if the searches are aggressively conducted. Cavity searches, in particular, involve the intrusive examination of intimate body parts and can cause physical pain or injury.

When conducted recklessly or without justification, these procedures are not only harmful but may also violate medical ethics and standards of care.

119. The systematic use of retaliatory strip and cavity searches contributes to a culture of abuse and fear that permeates the entire facility. This practice reinforces an abusive power dynamic, where staff exert control and punishment through physical violation, undermining any attempt at rehabilitation and encouraging resentment and disillusionment among detainees.

120. In many cases, retaliatory strip searches and cavity searches are conducted without proper oversight or accountability. Failure to report or document these searches, especially in cases where they are retaliatory, means that staff actions often go unchecked and remain unchallenged, which perpetuates a culture of impunity.

121. The practice of forced cavity searches has been reported as routine and is particularly disturbing when performed by four or more male probation officers on a single youth. This practice is characterized by Excessive use of force during searches that go far beyond any legitimate security need. No consent from the youth, many of whom report feeling humiliated and degraded during the procedure. A clear power dynamic where youth, especially Black boys, are objectified and treated as less than human, dehumanized in ways that foster ongoing trauma and psychological harm. Racial targeting is evident, as Black youth are disproportionately subjected to these invasive, degrading procedures, compounding the already pervasive racial discrimination in the juvenile justice system.

**Los Padrinos Staff Smuggled and Distributed Drugs to Juveniles**

122. Accounts from youth held at LA Probation facilities such as Los Padrinos Juvenile Hall allege a deeply troubling pattern of staff-facilitated

drug trafficking, in which probation officers themselves act as couriers or facilitators, exploiting institutional vulnerabilities and the youth's desperation. These schemes are enabled by systemic lapses in oversight, technological blind spots, and the coercive dynamics within juvenile detention settings.

123. Facility staff, who are charged with safeguarding detained youth, have reportedly engaged in or ignored the smuggling of narcotics into the facility. Youth with access to outside financial resources pay staff through mobile payment services such as Cash App in exchange for drugs. These transactions often occur without detection due to Inadequate surveillance of staff entering and exiting facilities and a culture of impunity, where reporting misconduct leads to retaliation or disbelief. Staff may conceal drugs in items such as food trays, hygiene products, or personal belongings, bypassing inadequate search procedures and exploiting trust within the facility.

124. In other cases, drone deliveries of contraband have become increasingly common due to poorly monitored perimeters and insufficient use of drone-detection technology or response protocols. Probation officers and/or staff may coordinate with outside individuals to retrieve these drone-delivered packages and ensure they reach the specific youth they are intended for. Alternatively, staff may ignore drone activity in exchange for kickbacks or fail to report known drop-offs.

125. These drone deliveries typically include: Marijuana, pills, or narcotics, Cell phones, vape pens, or tobacco, and Cash or other illicit items. In many juvenile detention facilities, staff bring in outside food, such as pizza, snacks, or candy, as "rewards" for compliance, silence, or participation in illicit activities. While seemingly benign on the surface, this

practice serves multiple corrupt purposes and often conceals deeper patterns of contraband smuggling, coercion, and power abuse.

126. Staff leverage fast food, candy, and snacks as behavioral control mechanisms, offering these items to youth in exchange for Participation in coerced fights ("gladiator matches"), Silence about abuse, assaults, or illegal activity, and Loyalty to specific staff members or gangs within the facility. This creates a dual economy within the institution: one in which food, a basic comfort denied in institutional meals, is used to manipulate and exploit detained youth. In facilities where hunger and poor-quality food are routine, these rewards carry significant psychological and emotional power.

127. Staff have used food deliveries to conceal narcotics, tobacco, vapes, pills, and even small electronics. This is done through tampered packaging, where substances are hidden inside wrappers or within hollowed-out items (e.g., pizza crusts, chip bags). Containers, such as fast food bags or soda cups, are used to smuggle drugs or phones. Layered packaging involves slipping contraband between napkins, beneath foil, or inside sealed snacks.

128. Because these food items often arrive under the guise of staff “treats” or informal reward systems, they bypass formal search protocols, especially if the delivery is not logged or monitored as official facility property. Once smuggled inside, the contraband is distributed through staff-controlled or gang-affiliated networks, often with the staff’s full knowledge or involvement. Youth may pay in advance through Cash App or family intermediaries.

129. Staff who participate in these schemes are often shielded by lax supervision, collegial silence, or complicity among coworkers, and retaliate against whistleblowers or detained youth who report abuses.

**No Hugs Policy**

130. Pursuant to Welfare and Institutions Code § 224.71, Youth are explicitly given the right to maintain frequent and continuing contact with parents, guardians, siblings children, and extended family members, through visits, telephone calls, and mail. Youth may be provided with access to computer technology and the internet for maintaining relationships with family as an alternative, but not as a replacement for, in-person visiting. Despite this right being statutorily guaranteed, visits are regularly denied and when allowed, there is a no hugging policy.

131. The denial of physical affection, specifically the refusal to allow families to hug their children during visitation, further highlights a systemic failure to support family connections and deprives youth of essential emotional and psychological support. This policy, or lack thereof, underscores the institution's punitive focus and its disregard for the well-being of youth, further alienating them from their families and communities, which is detrimental to their rehabilitation and mental health.

132. Denying families the ability to hug their children during visitation compounds the emotional trauma that minors in detention already experience. This policy limits a vital source of emotional support during visits. Physical touch, like hugging, is a critical component of familial bonding and emotional comfort. It plays a crucial role in fostering trust, affection, and a sense of security for minors. Exacerbates feelings of isolation and abandonment, which are already significant risks for youth in detention. Many of these youth, especially those with histories of trauma,

neglect, or abuse, rely on visitation as a chance to reconnect with their families and seek reassurance. Impedes the rehabilitation process by weakening family ties. Studies have shown that strong family connections are crucial to successful reintegration after release. Policies that prevent families from showing physical affection reduce the likelihood that youth will successfully reintegrate into society upon release, as these emotional bonds are not nurtured.

133. For families, the ability to hug and comfort their children during visits is often one of the few ways to maintain their bond. Restricting physical contact creates an emotional barrier between parents and their children, contributing to the feeling of institutionalized alienation. These families may already face significant stresses and hardships due to having a child in detention, and this policy deepens their sense of powerlessness and frustration. Parents are often denied the chance to reassure their children physically, at a time when their kids need it most. This denial can be particularly painful for families who feel they have limited contact with their children and depend on these brief moments for emotional healing.

134. This lack of physical affection is a particularly harsh policy for vulnerable youth, especially those who have already experienced trauma or abuse in their home lives, and for whom family visitation may be their only opportunity for a moment of tenderness and reassurance. The restriction of physical affection during visits can have direct consequences on the mental health and behavior of the detained youth. Denying a simple human need for physical comfort can lead to an increase in feelings of helplessness, depression, and anxiety among youth, who often perceive the lack of contact as a form of punishment. Further, it may intensify existing behavioral problems, as youth may lash out or withdraw emotionally due to

the added frustration and confusion over being denied a basic human interaction, and decrease the effectiveness of rehabilitation programs. Emotional stability and family support are vital elements of effective rehabilitation, and the removal of these aspects from the visitation process harms the overall recovery process for detained minors.

**Denial of Phone Calls**

135. The regular denial of phone calls as a form of punishment at Los Padrinos Juvenile Hall is yet another abusive practice that deprives youth of critical communication with their families, attorneys, and advocates. This reinforces the punitive, rather than rehabilitative, nature of the facility. This policy is harmful, not only because it limits the youth's access to emotional support but also because it violates their fundamental rights to maintain family relationships during detention. The denial of phone calls is a clear example of how the facility's practices disproportionately impact the mental health and rehabilitation of youth.

**Failure to Report Injuries and Medical Emergencies**

136. Based on information and belief, in LA Juvenile Probation Facilities, staff frequently withhold critical information from parents and guardians about the condition, safety, and well-being of detained youth. This practice includes failing to notify families about injuries, concealing incidents of abuse or violence, and obstructing communication between youth and their loved ones. The deliberate suppression of this information is emotionally devastating for families.

137. Youth who sustain injuries from fights, use of force by staff, or accidents often receive no external medical evaluation, and their families are never notified. Even when injuries are severe, such as concussions, broken bones, or pepper spray exposure, parents frequently learn only

after the fact, sometimes through court hearings or their child's own delayed account. This failure to notify violates the fundamental rights of parents to be informed about the health and safety of their children, particularly when the child is in state custody. This practice also violates the youths right guaranteed by Welfare and Institutions Code § 224.71(d) "To receive adequate, appropriate, and timely medical, reproductive, dental, vision, and mental health services provided by qualified professionals and consistent with current professional standards of care.

138. When youth attempt to report abuse whether physical, sexual, or psychological staff often fail to document or report these allegations to parents, mandated reporters, or child welfare agencies, in cases where youth are sexually harassed, assaulted, or subjected to excessive force, parents may remain unaware for months, particularly when youth lack access to unmonitored phone calls or visits. The withholding of this information enables abuse to continue and reflects a systemic culture of secrecy and institutional self-protection.

139. Staff at Los Padrinos have routinely restricted or revoked phone call privileges, especially for youth who challenge authority, file grievances, or experience abuse, by controlling who a youth can speak to and when, staff are able to suppress disclosures of mistreatment. Parents are often told that their child "doesn't want to talk" or is "on restriction," when in fact, communication is being blocked intentionally. During visitation, physical contact is prohibited, and conversations are often monitored or cut short, further limiting opportunities for disclosure.

140. Parents and advocates attempting to obtain medical records, behavioral reports, or incident documentation from Los Padrinos are often met with bureaucratic stonewalling. Staff may delay or deny access to

important files or provide incomplete information, preventing families from pursuing medical care, education accommodations, or legal remedies on behalf of their children.

141. Families experience profound distress, helplessness, and betrayal when they discover often too late, that their child has suffered harm in custody. Youth internalize the message that no one is coming to help them, further deepening trauma, distrust of adults, and psychological deterioration. These dynamics fracture familial bonds at a time when positive family connections are one of the few proven protective factors for justice-involved youth.

**Probation Staff, Gang Members**

142. Based on information and belief, Youth are subjected to ongoing abuse and unconstitutional conditions perpetrated and enabled by sworn Los Angeles County Probation Officers who are affiliated with street gangs operating both inside and outside the facility.

143. It is an open secret that many of the Probation Officers employed at Los Padrinos maintained active or recent ties to known Los Angeles-area street gangs and used their official positions to further gang-related interests within the facility.

144. These gang-affiliated Probation Officers Coordinated and encouraged violent fights between youth based on gang and racial lines; Used their street gang affiliation to intimidate and control youth in custody; Threatened minors with assault, isolation, or placement in rival gang units if they refused to comply with orders to fight; Facilitated gang retaliation by knowingly housing vulnerable youth with rivals; Displayed gang signs, used gang slang, and referenced specific gang affiliations while on duty;

145. Retaliated against youth who reported abuse or refused to follow gang-aligned orders.

146. Probation Officers with known ties to street gangs were protected by a code of silence within the LOS ANGELES COUNTY PROBATION DEPARTMENT. Despite their criminal affiliations and repeated misconduct, these officers were retained, promoted, or reassigned rather than disciplined or terminated.

147. Supervisors and administrators within the County and Probation Department either knew or were deliberately indifferent to the fact that sworn peace officers under their command were actively engaged in gang-aligned conduct and were using their positions to harm youth in custody.

148. Defendants COUNTY OF LOS ANGELES and LOS ANGELES COUNTY PROBATION DEPARTMENT maintained policies, customs, and practices that allowed this pattern of abuse and gang corruption to persist, including: Failing to screen or investigate employees for known gang affiliations; Turning a blind eye to obvious signs of criminal association among sworn officers; Retaliating against whistleblowers or officers who attempted to report misconduct; and Prioritizing institutional reputation over the safety and rights of youth in custody.

**Grievance Forms Not Available to Youth**

149. California Code of Regulations, Title 15, Section 1361 mandates that all youth in juvenile facilities be assured free access to a grievance procedure for fair hearing and resolution of complaints regarding their care and treatment, including mistreatment, harassment, or violation of the nondiscrimination policy. However, Los Padrinos Juvenile Hall has failed to comply, making it more difficult for youth to be able to report the abuses they suffer.

150. Based on information and belief, grievance forms are not available in youths housing units.

## IV. FACTUAL ALLEGATIONS

151. In March of 2025, JOHN DOE was detained in Los Padrinos Juvenile Hall. During intake, JOHN DOE experienced what he described as “weird, bad vibes” and refused to shower due to feeling unsafe undressing in front of staff. He was left in a holding tank for approximately six to eight hours without reprieve.

152. After intake, JOHN DOE was sent to his assigned room in Unit N. There, the staff refused to let him out of his room for days. Staff refused to allow JOHN DOE to exit his room to use the bathroom, so he was forced to relieve himself in a water bottle, multiple times. Other youth and staff came to his door, informing him that he had "eight fades" a term referring to scheduled fights he was expected to participate in, organized by the guards. Another youth from “Hoover,” which is a gang, reportedly had the same number of scheduled fights.

153. JOHN DOE received warnings from several youth inside the facility, who told him that more fights were coming. To date, JOHN DOE has been forced to fight approximately 15 to 20 times while in custody.

154. Fearful for his life and safety, in an attempt to be removed from the hostile environment, JOHN DOE falsely claimed he was experiencing withdrawal symptoms and begged to see the doctor. Rather than take him to the medical unit, staff transferred him to unit O.

155. Once in unit O, Plaintiff JOHN DOE was informed he had “three fades.” One of the fights occurred behind a row of bins, in the recreation yard and involved a youth affiliated with the Crips. During this incident, JOHN DOE observed facility staff nearby, but they did nothing to intervene.

Later the same day, he was forced to fight a second and third time inside a linen closet.

156. Despite JOHN DOE being forced to participate, DOE was written up for the second fight. Further, DOE was not taken to a medical unit for evaluation or treatment, despite having been involved in a physical altercation.

157. JOHN DOE was forced to fight in the linen closet on multiple occasions. Per Policy, staff were required to lock the closet and monitor its use. Instead, staff unlocked and used the area, known to be free from cameras, as a location to host the facilitated fights. At least ten to thirteen of these fights occurred inside the linen closet.

158. JOHN DOE was also attacked in the day room on multiple occasions.

159. During his detention, JOHN DOE was detained with his best friend from his neighborhood. JOHN DOE was traumatized when his best friend was pepper-sprayed directly in his eyes, then locked in his room for 15-30 minutes before the staff allowed him to go to the medic. For those 15 -30 minutes JOHN DOE was forced to listen to the screams and cries of agony of his best friend who was suffering from the effects of the pepper spray. This incident caused JOHN DOE to feel hopeless because he was once again reminded that abuse was just a daily reality in Los Padrinos.

160. JOHN DOE has observed a particular staff member distributing illicit drugs to some youth. He has also observed that said staff member exhibits erratic, violent behavior against other youth when “super drugged up.”

161. On Friday, April 11, 2025, Plaintiff JOHN DOE was attending class inside the juvenile facility when other youth offered him and a

classmate a drink from a juice packet. The drink appeared to be shared casually among students without supervision or inspection by staff.

162. Shortly after consuming the drink, JOHN DOE observed that his classmate began feeling unwell. DOE also started to feel unwell and requested that he be taken back to his room. Facility staff, specifically a female staff member, responded with visible annoyance rather than concern.

163. While walking back to his room, JOHN DOE lost consciousness. Hospital records confirm that JOHN DOE was administered multiple doses of Narcan to revive him from what was apparently a drug overdose. Facility staff later bragged and joked about the incident, laughing about the number of Narcan doses used to resuscitate him. The staff complained that it took six (6) doses to stabilize him. Two other youth also overdosed and were rushed to the hospital around the same time.

164. When JOHN DOE later regained consciousness in the hospital, he was disoriented and confused and felt like he was in a dreamlike state. During this time, he was calling out for his mother, but staff members who were present mocked him, laughing, and subsequently refused to allow him to contact his mother. Staff reportedly told him that he could not speak to her because "she might bring you something."

165. A medical provider at the hospital (described as an Indian man) told JOHN DOE that decisions regarding his treatment were "up to probation." However, JOHN DOE’s mother was told something entirely different by staff, indicating a lack of transparency and accountability in communication with his family. Further, his mother was not notified about the overdose until almost 10:30 PM, despite the overdose occurring over 12 hours before.

166. The same night, around 11:00 p.m., JOHN DOE was discharged from the hospital and placed in the facility's medical module, where he was held on lockdown for the entire weekend. He did not feel safe in the room, and no additional support or psychological care was offered to him despite the traumatic experience.

167. JOHN DOE believed he was going to die and felt that the staff "didn't care" about his well-being. Despite notifying staff multiple times that he still felt unwell, they refused to respond until he simulated overdosing again, which prompted them to take him back to the hospital.

168. Staff continue to mock JOHN DOE and blame him for “messing up their business” due to the increased security in the wake of the overdoses. JOHN DOE and the entire facility were on lockdown for the entire weekend. All visits were cancelled for the weekend, and JOHN DOE was unable to speak with his mother until Monday.

169. JOHN DOE fears he was targeted and used a guinea pig for what was known to be a bad batch of drugs, because he is not as aggressive as other youth he is detained with.

170. The Tuesday following the incident, facility staff conducted a cavity search of the youth in his unit. JOHN DOE and his entire class were pulled out two by two for the search.

171. The search squad, also known as the black squad, came to search John Doe and the rest of his unit while he was in school. They put sticky notes over their badges in order to conceal their identities. The black squad also disposed of his notebook where he was documenting the abuses he was experiencing.

172. JOHN DOE was the last to be taken, along with another youth. He was required to fully disrobe in front of staff.

173. Prior to the search, facility staff signed official paperwork on behalf of JOHN DOE, despite him not providing informed consent to the search or to the documentation being completed in his name.

174. The search was conducted by a group of what felt like twenty (20) male staff members. It occurred inside a bathroom with windows, through which other individuals could see. There was no privacy provided. JOHN DOE attempted to refuse unsuccessfully.

175. During the search, JOHN DOE was made to remove all of his clothing and expose his body in front of the staff. He was subsequently directed to bend over and cough. When he refused, he was threatened with being pepper-sprayed and physically pushed down. He felt deeply violated, humiliated, and unsafe.

176. Both staff and other youth told JOHN DOE that the bathroom where the search occurred was visible to facility cameras, raising further concerns about who could observe his naked body and whether the footage could be stored, shared, or reviewed.

177. The nature and manner of the cavity search were degrading, excessive, and conducted without adequate justification, privacy protections, or procedural safeguards. The experience left JOHN DOE traumatized and fearful of further retaliation or abuse.

178. Since the overdose, JOHN DOE has been repeatedly denied phone calls, denied access to the medical module, and pepper-sprayed multiple times, unprovoked; his unit has been put on lockdown repeatedly for the actions of individuals.

179. A staff member which at this time can only be identified as characterized by the youth statements describing him as a “ fat, Mexican guy” told John Doe “if I was there that day I would’ve let you die,” JOHN

DOE understood this comment to be a threat on his life and fears for his safety.

180. Plaintiff does not know the name of the staff member who made the statement described above. He is a male member of the Los Padrinos staff who was present at the facility during Plaintiff's detention, and youth identified him by the description "fat, Mexican guy." Plaintiff will identify him by name through discovery and will amend this Complaint accordingly.

181. While in custody at Los Padrinos Juvenile Hall, John Doe was routinely denied his right to communicate with his attorney. On multiple occasions, when Doe's legal counsel attempted to contact him by phone to discuss urgent legal matters, probation staff either refused to bring him to the phone or claimed he was unavailable without making any effort to facilitate the call. These denials occurred despite advance notice from his attorney and a clear understanding that such communication was protected under both state law and constitutional due process principles. In some instances, staff informed Doe of the attempted calls only after the fact, further depriving him of the opportunity to participate in his own legal defense.

182. This obstruction of attorney-client communication not only violated Doe's Sixth and Fourteenth Amendment rights, but also contravened California law guaranteeing youth in custody access to legal counsel. The failure to facilitate timely and confidential communication with his lawyer interfered with Doe's ability to understand court proceedings, prepare for hearings, and assert his legal rights. It also left him isolated and without the support of his legal advocate during a period when he was facing abuse, coercion, and significant psychological stress inside the facility. These repeated denials of access were not isolated incidents but

part of a broader pattern of indifference to the legal rights and well-being of youth in Los Angeles County's juvenile detention system.

183. JOHN DOE has been used to relay sexual messages between staff and other youth, fearing retaliation if he failed to comply.

184. JOHN DOE has also been subjected to sexual harassment by female guards. A female staff member told JOHN DOE that he was a "big boy," when he asked "what do you mean?" She looked at his pelvic area and said "that right there, boy stop playing" in their following interactions the female staff member offered him snacks and repeatedly invited him to come into the office with her.

185. Plaintiff is informed and believes, and thereon alleges, that ANGELICA CHICAS was among the female guards and/or custodial staff who sexually harassed, sexually humiliated, improperly viewed, improperly commented on, improperly invited, groomed, exploited, or otherwise abused their authority over Plaintiff while he was a minor in custody. Plaintiff does not yet know the full scope of their involvement, the identity of every female guard involved, or the complete chain of supervision because Defendants control the relevant duty rosters, video, post orders, shift logs, incident records, PREA records, personnel records, and investigative files.

186. Plaintiff reported the sexual abuse he was suffering at Los Padrinos to Defendant HEIDI DOE. Plaintiff alleges, on information and belief, that HEIDI DOE thereby knew or reasonably suspected that Plaintiff was being sexually abused by County staff.

187. Under California Penal Code section 11166, HEIDI DOE was required, upon knowing or reasonably suspecting that a child in custody had been subjected to sexual abuse, to make a report to a designated child protective agency or law enforcement agency immediately or as soon as

practically possible, and to file a written report within the time required by statute.

188. On information and belief, HEIDI DOE failed to make any such report to a child protective agency or law enforcement agency, failed to report Plaintiff's disclosure through the County's supervisory, PREA, or other internal reporting channels, and took no action to protect Plaintiff from continued abuse.

189. HEIDI DOE's failure to act on Plaintiff's report was a substantial factor in causing Plaintiff's continued exposure to sexual abuse and the injuries alleged herein. The County is liable for HEIDI DOE's failure to report under Government Code section 815.2, and is liable under Government Code section 815.6 for its failure to discharge its mandatory duties to enforce mandated-reporting requirements, as alleged above.

190. Any purported consent, silence, compliance, or failure to physically resist was legally and factually meaningless because Plaintiff was a detained minor under the control of adult custodial staff who controlled his movement, food, housing, discipline, phone access, safety, medical access, and exposure to retaliation. Plaintiff was not in a position to consent freely to sexualized comments, sexualized viewing, sexualized invitations, coercive conduct, or any sexualized exploitation by staff.

191. JOHN DOE has suffered tremendously every day of his pre-trial detention, despite not having been convicted of a crime.

## FIRST COUNT

## Violation of Civil Rights – 42 U.S.C. § 1983 (Excessive Force – Against DOES 1–100)

192. Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

193. At all relevant times, Plaintiff JOHN DOE was a minor detained at Los Padrinos Juvenile Hall, a juvenile facility operated by the Los Angeles County Probation Department. Plaintiff was in the legal custody and physical control of County officials and staff, including the named Defendants and DOES 1 through 100.

194. The individual Defendants, while acting under color of state law and within the course and scope of their employment, used excessive and unreasonable force on the Plaintiff. This included, but was not limited to: forcing Plaintiff to engage in multiple violent altercations with other youth under staff supervision and coercion; threatening and exposing Plaintiff to retaliation if he refused to fight; pepper-spraying the Plaintiff and other youth without provocation; and subjecting Plaintiff to degrading and unjustified strip and cavity searches.

195. Plaintiff is informed and believes that DOES 1–100 organized and facilitated the fights, including the scheduled "fades" Plaintiff was told he had, assigned Plaintiff to fights in the linen closet, which staff unlocked and used in violation of policy, and observed the fights without intervening.

196. Defendants organized and facilitated these "fades" or forced fights as a form of punishment, control, or entertainment, completely untethered to any legitimate correctional objective. At no time did Plaintiff pose a threat to himself or others justifying such use of force.

197. The force used against Plaintiff was objectively unreasonable, excessive, and applied maliciously and sadistically to cause harm. Plaintiff was subjected to at least 15 to 20 forced fights, many of which took place in locations such as linen closets and the recreation yard, where staff knew camera surveillance was limited or nonexistent.

198. Such force was not only excessive in its physicality but in its psychological impact. After one fight, Plaintiff was mocked, denied medical care, and written up for misconduct, despite being forced into the altercation under threat of further violence.

199. As a result of Defendants' actions, Plaintiff suffered significant physical pain, psychological trauma, and lasting emotional injuries. The conduct of the individual Defendants shocks the conscience and violated Plaintiff's clearly established rights under the Fourteenth Amendment to the United States Constitution.

200. The conduct of the individual Defendants was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Plaintiff, thereby entitling Plaintiff to exemplary and punitive damages.

## SECOND COUNT

## Violation of Civil Rights – 42 U.S.C. § 1983 (Denial of Medical and Mental Health Care – Against Defendants HEIDI DOE and DOES 1–100)

201. Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

202. At all relevant times, Plaintiff JOHN DOE was a minor detainee under the care and custody of the Los Angeles County Probation Department. Defendants owed Plaintiff a constitutional duty to provide timely and adequate medical care.

203. Defendants knew that Plaintiff faced serious medical needs and conditions, including: physical injuries from repeated fights; the psychological aftermath of witnessing his best friend scream in agony from OC spray exposure; symptoms of a drug overdose on or about April 11, 2025, which required six doses of Narcan; disorientation, confusion, and

pain following the overdose and his hospitalization; persistent symptoms thereafter which Plaintiff reported to staff but were ignored.

204. Staff disregarded Plaintiff's medical needs in specific ways. When Plaintiff claimed withdrawal symptoms to see a doctor, staff transferred him to unit O instead of taking him to the medical unit. After a fight in unit O, Plaintiff was not taken to a medical unit for evaluation. After his overdose, Plaintiff was placed on lockdown in the medical module for the weekend, and staff ignored his repeated complaints until he simulated another overdose to obtain treatment.

205. Despite these known conditions, Defendants acted with deliberate indifference to Plaintiff's serious medical needs. Instead of responding with urgency, Defendants mocked Plaintiff, denied him access to medical professionals, refused to allow him to call his mother, and failed to provide psychological follow-up or emotional support.

206. Plaintiff was discharged from the hospital and placed on lockdown in the medical module without adequate supervision, support, or access to care. When Plaintiff complained of continued symptoms, he was ignored until he simulated another overdose in desperation to receive treatment.

207. This indifference extended even to the point of humiliation and cruelty, Defendants openly joked about the number of Narcan doses needed to revive Plaintiff, emphasizing that his life-saving treatment was burdensome and laughable.

208. The denial of medical care constituted a violation of Plaintiff's rights under the Fourteenth Amendment to the United States Constitution. Plaintiff suffered prolonged and unnecessary pain, emotional distress, and fear for his life as a result.

209. The acts and omissions of Defendants were willful, wanton, malicious, and done with reckless disregard for Plaintiff's rights and safety, entitling Plaintiff to compensatory and punitive damages.

210. Defendant HEIDI DOE, in her capacity as a mental health professional employed by the County at Los Padrinos, had actual knowledge of Plaintiff's acute psychological trauma, substance exposure, and physical distress following his overdose and reports of abuse. Defendant HEIDI DOE acted with objective deliberate indifference by failing to provide, summon, or facilitate necessary mental health evaluations, trauma counseling, or protective medical referrals, thereby causing Plaintiff to suffer prolonged psychological anguish.

**THIRD COUNT**

**Violation of Civil Rights – 42 U.S.C. § 1983 (Unconstitutional Conditions of Confinement and Failure to Protect – Against CHIEF VIERA ROSA, HEIDI DOE, and DOES 1–100)**

211. Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

212. At all relevant times, Plaintiff JOHN DOE was a minor detained at Los Padrinos Juvenile Hall and under the custody and control of Defendants.

213. Plaintiff was subjected to harsh, unsafe, and punitive conditions of confinement, including but not limited to: being left in a holding cell for 6 to 8 hours during intake; being confined in his room for days without access to basic services; being forced into 15 to 20 violent fights, with staff awareness or orchestration; exposure to pepper spray and verbal abuse; denial of family contact, phone calls, and medical access; forced strip

searches in public view under degrading and humiliating circumstances; exposure to illicit drug distribution and overdoses within the facility.

214. Staff kept Plaintiff confined to his room for days, refused to let him leave the room to use the bathroom, forcing him to urinate in a water bottle, and denied him phone calls and access to his attorney while he was in custody.

215. These conditions were not reasonably related to a legitimate governmental objective and were intended to punish and degrade Plaintiff. Such treatment violated Plaintiff's Fourteenth Amendment right to substantive due process and freedom from punishment as a pretrial juvenile detainee.

216. Defendants' conduct was willful, wanton, and done with reckless disregard for Plaintiff's constitutional rights, entitling Plaintiff to compensatory and punitive damages.

217. Defendant HEIDI DOE was personally told by Plaintiff that he was being targeted for sexual harassment and physical violence by facility staff. Despite possessing the authority and obligation to initiate protective interventions, Defendant HEIDI DOE made the intentional decision to take no protective measures, exhibiting deliberate indifference to the obvious and substantial risk of serious harm confronting Plaintiff.

**FOURTH COUNT**

**Violation of Civil Rights – 42 U.S.C. § 1983 (Sexual Abuse / Invasion of Bodily Privacy)**

(Against Defendants ANGELICA CHICAS, HEIDI DOE, and DOES 1–100, in Their Individual Capacities)

218. Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

219. At all relevant times, Defendants acted under color of state law. Detained juveniles possess a clearly established Fourteenth Amendment substantive due process right to bodily integrity, personal dignity, and freedom from sexual exploitation, sexual harassment, and invasive, degrading searches by custodial staff.

220. Defendant ANGELICA CHICAS engaged in a calculated pattern of grooming, sexual harassment, and non-consensual sexual abuse against Plaintiff while he was an involuntary minor detainee under her physical custody and authority. Specifically:

(a) Defendant CHICAS exploited Plaintiff's complete custodial dependency by offering him contraband snacks and repeatedly summoning and inviting him into an enclosed private office with her;

(b) Defendant CHICAS subjected Plaintiff to sexually explicit comments regarding his anatomy, specifically telling him he was a "big boy," visually scrutinizing and staring at his pelvic and genital area, and stating "that right there, boy stop playing";

(c) While isolated inside the facility office, Defendant CHICAS subjected Plaintiff to non-consensual, coercive sexual touching and an unconsensual sexual encounter, exploiting her position of custodial dominance, Plaintiff's fear of physical retaliation, and the threat of disciplinary isolation or reassignment to high-violence units. Plaintiff did not and could not legally or factually consent to any sexual contact with custodial staff; and

(d) Defendant CHICAS further participated in, directed, and facilitated the sexually humiliating climate and retaliatory searches to maintain Plaintiff's submission and silence.

221. Defendant HEIDI DOE was personally informed by Plaintiff of the ongoing sexual abuse and grooming perpetrated by custodial staff. Rather than intervening or executing her mandatory reporting duties, Defendant HEIDI DOE demonstrated deliberate indifference and complete inaction, concealing Plaintiff's disclosure, failing to summon protective interventions, and leaving Plaintiff exposed to continued sexual exploitation and trauma in violation of his Fourteenth Amendment rights.

222. Furthermore, DOES 1–100 subjected Plaintiff to an unreasonable, degrading, and suspicionless mass strip and body cavity search in an open bathroom with exterior windows and camera surveillance, forcing him to disrobe before approximately twenty male staff, bend over, and cough, and threatening him with chemical spray when he resisted.

223. The conduct of Defendants CHICAS, HEIDI DOE, and DOES 1–100 lacked any legitimate penological justification, shocked the conscience, and was undertaken maliciously, sadistically, and with reckless disregard for Plaintiff's constitutional rights, entitling Plaintiff to compensatory and punitive damages.

**FIFTH COUNT**

**Sexual Assault and Battery of a Minor (Cal. Civ. Code §§ 1708, 1708.5, 1708.5.5; Code Civ. Proc. § 340.1)**

(Against Defendants ANGELICA CHICAS, DOES 1–100, and COUNTY OF LOS ANGELES Under Gov. Code § 815.2)

224. Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

225. Defendant ANGELICA CHICAS committed sexual assault and sexual battery upon Plaintiff, a seventeen-year-old minor in County

custody, in violation of California Civil Code §§ 1708, 1708.5, and 1708.5.5, and within the meaning of Code of Civil Procedure § 340.1.

226. Specifically, Defendant CHICAS:

(a) Coerced Plaintiff into an isolated environment through grooming and gifts of food, where she subjected him to unconsensual, offensive sexual touching of his intimate body parts and engaged in an unconsensual sexual encounter;

(b) Made sexually explicit remarks directing attention to his genitalia, explicitly using her custodial dominance and authority to compel submission; and

(c) Subjected Plaintiff to intimate physical contact that was harmful, offensive, and without legal consent. Any claimed assent was void as a matter of law due to Plaintiff's status as a minor held in involuntary juvenile detention.

227. In addition, DOES 1–100 subjected Plaintiff to invasive, humiliating manual and visual body cavity exposure and physical coercion during the mass bathroom search, pushing Plaintiff down and threatening him with physical force.

228. Pursuant to California Code of Civil Procedure § 340.1 and California Government Code § 905(m), this cause of action is exempt from government tort claim presentation deadlines and is timely commenced.

229. Under California Government Code § 815.2(a), Defendant COUNTY OF LOS ANGELES is vicariously liable for the injuries caused by its employees acting within the scope of their employment, and the County has no immunity under Government Code § 844.6 because this claim arises out of childhood sexual assault under Code of Civil Procedure §

340.1 and is reinforced by the statutory immunity waiver of Civil Code § 52.1(n).

230. As a direct and proximate result, Plaintiff suffered profound sexual trauma, severe psychological injury, and emotional distress, entitling him to compensatory and punitive damages against Defendant CHICAS and compensatory damages against the COUNTY.

**SIXTH COUNT**

**Intentional Infliction of Emotional Distress (Against ANGELICA CHICAS and DOES 1–100)**

231. Plaintiff incorporates by reference all prior paragraphs as though fully set forth herein.

232. Defendants' conduct, including orchestrating forced fights, mocking Plaintiff following a near-fatal overdose, denying medical and emotional support, conducting public strip searches, and facilitating the abuse of other minors, was extreme, outrageous, and beyond the bounds of human decency.

233. Defendants acted intentionally or with reckless disregard of the probability that their conduct would cause Plaintiff to suffer severe emotional distress.

234. Plaintiff is informed and believes that a female staff member told Plaintiff he was a "big boy," looked at his pelvic area, and repeatedly invited Plaintiff into an office with her while offering him snacks. Plaintiff is informed and believes that this conduct was committed by ANGELICA CHICAS or by another female staff member to be identified in discovery.

235. As a direct and proximate result, Plaintiff did suffer severe and ongoing emotional distress, including symptoms of trauma, fear, depression, and hopelessness.

236. The conduct of Defendants warrants the imposition of punitive damages to deter such conduct in the future.

**SEVENTH COUNT**

**Negligent Supervision, Hiring, and Retention**

(Against COUNTY OF LOS ANGELES and DOES 1–40)

237. Plaintiff incorporates by reference all prior paragraphs as though fully set forth herein.

238. While public entities are generally subject to statutory limitations under Government Code § 815, Defendant COUNTY OF LOS ANGELES is directly and vicariously liable under express statutory exceptions:

(a) Direct liability under California Government Code § 815.6 for failure to discharge mandatory statutory and regulatory duties imposed by California Code of Regulations, Title 15, Section 1321 (staff-to-youth ratios and safety staffing), Section 1324 (screening and safety), and California Penal Code §§ 11165.7 and 11166 (mandated child abuse reporting protocols);

(b) Direct liability under California Code of Civil Procedure § 340.1(b) for entity negligence in hiring, supervising, training, and retaining employees who commit childhood sexual assault; and

(c) Vicarious liability under California Government Code § 815.2(a) for the tortious acts of supervisory staff DOES 1–40 acting within the scope of their employment.

239. The COUNTY and its supervisory officials breached these duties by knowingly retaining probation officers with active street-gang affiliations, maintaining officers known to arrange “fades” in hidden camera

blind spots, and failing to investigate or discipline officers who engaged in sexual grooming, harassment, and physical abuse.

240. The statutory immunity of Government Code § 844.6 does not shield the COUNTY here because:

(a) Claims rooted in childhood sexual assault under Code of Civil Procedure § 340.1 are actionable against public entities that negligently hire, retain, or supervise tortfeasors;

(b) The mandatory duty provisions of Government Code § 815.6 override general prisoner immunity; and

(c) The Bane Act (Civil Code § 52.1(n)) explicitly abrogates Government Code § 844.6 immunity for the ongoing coercive and threatening custodial conduct alleged herein.

241. As a direct and proximate result of Defendants' negligent hiring, supervision, and retention, Plaintiff suffered severe physical injury, sexual victimization, and psychological devastation.

**EIGHTH COUNT**

**Negligence (Including Failure to Summon Medical Care – Gov. Code § 845.6)**

(Against Defendants COUNTY OF LOS ANGELES, HEIDI DOE, and DOES 1–100)

242. Plaintiff incorporates by reference all prior paragraphs as though fully set forth herein.

243. Defendants owed Plaintiff a duty of reasonable care arising out of the special custodial relationship between a detained child and his custodial keepers.

244. Express Statutory Exception to Immunity (Gov. Code § 845.6): Pursuant to California Government Code § 845.6—which is an express,

enumerated exception to prisoner immunity under Government Code § 844.6(a)—a public entity and its employees are liable when an employee knows or has reason to know that a person in custody is in need of immediate medical care and fails to take reasonable action to summon such medical care.

245. When Plaintiff ingested a contaminated narcotic drink on April 11, 2025, lost consciousness, and began foaming at the mouth, Defendants DOES 1–100 knew of his acute, life-threatening overdose condition yet initially mocked him, exhibited annoyance, and delayed summoning emergency life support until six doses of Narcan were required. Following hospital discharge, when Plaintiff reported acute, recurring neurological and physical symptoms in the medical module, staff intentionally ignored his pleas, requiring him to simulate a second overdose to obtain medical attention. This failure to summon immediate care directly violated Government Code § 845.6 and binds Defendant COUNTY OF LOS ANGELES.

246. Liability for Mandated Reporter Negligence (Evid. Code § 669; Penal Code § 11166): Defendant HEIDI DOE, a licensed DMH employee and designated mandated reporter under Penal Code § 11165.7, owed Plaintiff an affirmative statutory duty to immediately report suspected child sexual abuse upon receiving Plaintiff's disclosures. Under California Evidence Code § 669, her failure to report child abuse constitutes negligence per se. Defendant COUNTY OF LOS ANGELES is vicariously liable for HEIDI DOE's failure under Government Code § 815.2, and directly liable under Government Code § 815.6 and CCP § 340.1.

**NINTH COUNT**

**Violation of the Bane Act (Cal. Civ. Code § 52.1) (Against ANGELICA CHICAS, COUNTY OF LOS ANGELES, and DOES 1–100)**

247. Plaintiff incorporates by reference all prior paragraphs as though fully set forth herein.

248. The Bane Act protects individuals from interference or attempted interference with their constitutional and statutory rights through threats, intimidation, or coercion.

249. Defendants violated Plaintiff's rights under the U.S. and California Constitutions, including his rights to bodily integrity, medical care, freedom from excessive force, and freedom from unlawful searches, through coercive and abusive conduct, including: threatening and facilitating forced fights; denying care after a drug overdose; conducting coercive strip and cavity searches; intimidating Plaintiff into silence; retaliating against him for reporting abuse.

250. Defendants' coercion was not limited to the underlying violations. Defendants threatened Plaintiff with further violence, including by forcing him into fights and by threatening him with pepper spray when he refused to comply with a search. A staff member also told Plaintiff, in substance, that if the staff member had been present on the day of Plaintiff's overdose, the staff member would have let Plaintiff die. Plaintiff reasonably understood these threats as threats to his life and safety, and feared for his safety. These threats were made to compel Plaintiff's compliance and silence.

251. ANGELICA CHICAS sexually abused Plaintiff and used that abuse to humiliate him. Before and during that abuse, she exploited Plaintiff's dependence on custodial staff by offering him snacks and

repeatedly inviting him into an office. The sexual humiliation was retaliation intended to coerce Plaintiff's compliance and silence, and Plaintiff's submission to her conduct was not consensual and was compelled by fear of that retaliation.

252. Defendants' conduct was not only unlawful, but carried out with the intent to chill or punish the exercise of constitutional rights.

253. As a result, Plaintiff suffered damages, including physical injuries, emotional distress, and trauma, and is entitled to compensatory and statutory damages against COUNTY OF LOS ANGELES, and to compensatory, punitive, and statutory damages against the individual Defendants, under Cal. Civ. Code §§ 52 and 52.1, including reasonable attorney's fees.

**TENTH COUNT**

**Negligent Failure to Train, Warn, or Educate (Against COUNTY OF LOS ANGELES)**

254. Plaintiff incorporates by reference all prior paragraphs as though fully set forth herein.

255. At all relevant times, Defendant COUNTY OF LOS ANGELES had a duty to adequately train and educate its employees and officers regarding: supervision of detained youth; use of force and de-escalation; emergency medical care; constitutional rights of minors in custody; the prevention of trafficking, abuse, and coercion; lawful and trauma-informed search procedures.

256. The County's failures to train and supervise its staff were a substantial factor in the falsified records, untrained staff, and excessive force that inspectors documented at Los Padrinos throughout 2024. The County knew of these deficiencies through the BSCC findings described

above, including the August 2024 notice of noncompliance under Title 15, section 1321, and the October 2024 determination that Los Padrinos was unsuitable for juvenile confinement, and failed to correct them. The County's duty to train its staff is mandatory. It is imposed by Government Code section 815.6 and by the BSCC minimum standards in California Code of Regulations, title 15, and the County is liable under Government Code section 815.6 for its failure to discharge that duty.

257. The County's notice of these dangers, as alleged above, is incorporated herein by reference.

258. Defendants breached this duty by failing to implement, provide, or enforce sufficient training, education, and oversight. As a result, custodial staff were permitted to engage in egregious misconduct that caused foreseeable harm.

259. The lack of training and failure to warn staff about the illegality of their conduct was a direct and proximate cause of Plaintiff's physical injuries, emotional distress, and psychological trauma.

**ELEVENTH COUNT**

**Constructive Fraud (Cal. Civ. Code § 1573; Fed. R. Civ. P. 9(b))**

(Against Defendants COUNTY OF LOS ANGELES and DOES 1–100)

260. Plaintiff incorporates by reference all prior paragraphs as though fully set forth herein.

261. A confidential and fiduciary relationship existed between Plaintiff, an incarcerated minor child, his mother, and Defendants. Because Plaintiff was completely confined and dependent upon Defendants for all physical needs, communication, and medical care, Defendants possessed exclusive knowledge of facility conditions and medical emergencies.

262. In satisfaction of Federal Rule of Civil Procedure 9(b), Plaintiff specifies the following fraudulent representations, acts of concealment, and document falsifications:

(a) Concealment and False Statements Regarding Overdose Severity: On April 11, 2025, between approximately 11:00 a.m. and 10:30 p.m., Los Padrinos supervisory and medical staff intentionally concealed Plaintiff's life-threatening drug overdose from his mother. At approximately 10:30 p.m. on April 11, 2025, a County probation officer contacted Plaintiff's mother and affirmatively misrepresented Plaintiff's medical condition, falsely stating that Plaintiff was stable, had experienced minor intoxication, and had received standard care, intentionally omitting that Plaintiff had lost consciousness, foamed at the mouth, required six emergency doses of Narcan, and had been admitted to an outside emergency department. Staff told Plaintiff that he was prohibited from calling his mother from the hospital because "she might bring you something"—a known falsehood manufactured to conceal his critical medical state and isolate him from parental advocacy.

(b) Falsification of Search Consent Documentation: On or about April 14, 2025, immediately preceding the mass bathroom strip search, members of the "search squad" / DOES 1–100 produced an administrative search authorization form. Staff forged Plaintiff's signature and falsely completed the form to show that Plaintiff had knowingly, voluntarily, and intelligently consented to an invasive strip and cavity search. Staff utilized

this fraudulent record to shield themselves from regulatory audit and conceal the coercive, non-consensual nature of the search.

(c) Concealment of Administrative Grievance Process: Throughout March, April, and May 2025, facility supervisors in Units N and O intentionally removed and failed to stock juvenile grievance forms mandated by Title 15 CCR § 1361, while falsely representing to youth that grievances had to be verbalized directly to unit guards.

263. Defendants undertook these acts of misrepresentation and concealment to maintain custodial control, prevent outside legal or parental intervention, and insulate facility staff from state regulatory sanctions.

264. Plaintiff and his mother reasonably relied on Defendants' statements and custodial authority, resulting in the deprivation of timely legal and medical assistance, prolonged trauma, and violation of statutory rights under Civil Code § 1573.

## TWELFTH COUNT

## Supervisor Liability – 42 U.S.C. § 1983

(Against CHIEF VIERA ROSA and DOES 1–40, Inclusive, in Their Individual Capacities)

265. Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

266. At all relevant times, DOES 1-10 was a supervising official at Los Padrinos Juvenile Hall employed by the Los Angeles County Probation Department and acting under color of state law. Plaintiff is informed and believes, and thereon alleges, that DOES 1–10 acted with deliberate indifference to Plaintiff's constitutional rights by failing to prevent, correct, or

remedy unlawful acts committed by subordinate staff under their supervision.

267. DOES 1-10 knew or should have known that staff at Los Padrinos were engaging in a longstanding and well-known practice of facilitating organized fights ("fades"), conducting unlawful strip and cavity searches, mocking youth after overdoses, and distributing or enabling access to illicit drugs. Despite this knowledge, DOES 1-10 failed to take any reasonable steps to prevent or stop this misconduct.

268. Rather than respond appropriately to JOHN DOE's reports of distress, DOES 1- 10 transferred him from Unit N to Unit O, knowing, or with reckless disregard for the fact, that Unit O was also known for staff-facilitated fights. After this transfer, JOHN DOE was forced into multiple fights, including those occurring in areas not monitored by security cameras (e.g., linen closets and the recreation yard), all of which occurred under the supervision and tolerance of senior staff.

269. Defendant DOES 1–10 failed to properly supervise, train, discipline, or intervene against subordinate staff who routinely violated the rights of youth in their care by: permitting and encouraging violence among youth; failing to respond to serious medical emergencies and overdoses; mocking and degrading youth during periods of medical distress; subjecting youth to unconstitutional strip and cavity searches; denying youth access to family contact and medical/mental health support.

270. Defendant DOES 1-10 had notice of unconstitutional conditions and staff misconduct through direct observation, incident reports, staff communications, youth complaints, and institutional patterns, yet failed to act. These omissions were the moving force behind the violations of Plaintiff's rights under the Fourteenth Amendment.

271. The acts and omissions of Defendant supervisory DOES 1–10 amounted to deliberate indifference to the health, safety, and constitutional rights of JOHN DOE, who suffered severe physical and psychological injuries as a result.

272. As a direct and proximate result of the conduct of Defendant supervisory DOES 1–10, Plaintiff sustained damages including emotional distress, trauma, humiliation, pain, and loss of dignity. Plaintiff is entitled to compensatory damages and, against the individual defendants, punitive damages.

273. CHIEF VIERA ROSA is liable under 42 U.S.C. § 1983 for his own deliberate indifference to the substantial risk of harm to Plaintiff described above, as alleged in the preceding paragraphs.

**THIRTEENTH COUNT**

**Childhood Sexual Assault – Code of Civil Procedure § 340.1**

(Against ANGELICA CHICAS, DOES 1–100, and COUNTY OF LOS ANGELES Under Government Code § 815.2)

274. Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

275. Plaintiff JOHN DOE was seventeen years old at all times relevant to the acts alleged in this count and was in the custody of Defendants at Los Padrinos Juvenile Hall.

276. Defendant ANGELICA CHICAS committed, participated in, directed, facilitated, or enabled acts of childhood sexual assault against Plaintiff, including sexual touching, sexual battery, sexual harassment, sexual humiliation, and invasive observation, exposure, and search of Plaintiff's body, as that term is defined in Code of Civil Procedure section 340.1.

277. Plaintiff did not consent. Any purported consent is legally ineffective because Plaintiff was a minor in custody and Defendants exercised coercive custodial authority over him.

278. This action is timely under Code of Civil Procedure section 340.1 because Plaintiff was a minor when the childhood sexual assault occurred, and this action is commenced within the time permitted by that statute.

279. Government Code section 905, subdivision (m) does not require presentation of a claim before suit on a cause of action under Code of Civil Procedure section 340.1. No government claim is therefore required for Plaintiff's childhood sexual assault cause of action against the County.

280. The County is vicariously liable under Government Code section 815.2 for the acts of CHICAS and other County employees committed within the course and scope of their employment, and is directly liable for its own negligent hiring, retention, supervision, training, and failure to protect as alleged above.

281. As a direct and proximate result of Defendants' conduct, Plaintiff suffered sexual trauma, emotional distress, humiliation, loss of dignity, psychological injury, and other damages according to proof. Plaintiff is entitled to compensatory damages and, against the individual Defendants, punitive damages.

**FOURTEENTH COUNT**

**Breach of Mandatory Duty – Cal. Gov. Code § 815.6**

(Against COUNTY OF LOS ANGELES)

282. Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

283. Government Code section 815.6 imposes liability on a public entity that fails to discharge a mandatory duty imposed by an enactment designed to protect against the risk of the type of injury suffered. The County owed Plaintiff mandatory duties under enactments including California Code of Regulations, title 15 (the BSCC minimum standards), including section 1321 (staffing) and the standards governing safety checks, room confinement, use of force, and grievance procedures, including section 1361; Welfare and Institutions Code section 224.71 (private communication with counsel); and Penal Code sections 11165.7 and 11166 (mandated reporting of child sexual abuse).

284. These duties are mandatory and ministerial, not discretionary. Each is designed to protect detained youth from the risks Plaintiff suffered, including unsafe staffing, inadequate supervision, unlawful searches and use of force, denial of communication with counsel and family, denial of medical care, and sexual abuse.

285. The County breached these duties. As described above, the BSCC found that Los Padrinos was noncompliant with Title 15 section 1321 on staffing, failed to conduct regular safety checks, and improperly used restraints, and the BSCC Board upheld those findings in April 2025. During the period of Plaintiff's detention, Plaintiff was forced into repeated fights, subjected to a strip search, denied medical care after an overdose, and denied contact with his mother.

286. The County's failure to discharge these mandatory duties was a substantial factor in causing Plaintiff's injuries and damages according to proof. Plaintiff's injuries are the type of harm these enactments were designed to prevent.

## FIFTEENTH COUNT

**Violation of Civil Rights – 42 U.S.C. § 1983 (Municipal Liability for Unconstitutional Customs, Practices, Failure to Train and Supervise)**

(Against Defendant COUNTY OF LOS ANGELES)

287. Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

288. At all relevant times, Defendant COUNTY OF LOS ANGELES operated, managed, and controlled Los Padrinos Juvenile Hall through the Los Angeles County Probation Department and was acting under color of state law.

289. Defendant COUNTY OF LOS ANGELES is directly liable for injuries inflicted upon Plaintiff pursuant to its official policies, widespread informal customs, pervasive administrative practices, and deliberate indifference in training, supervising, and disciplining its detention staff.

290. At the time of Plaintiff's detention, the COUNTY maintained, tolerated, and ratified well-settled customs and practices that violated detained youths' Fourteenth Amendment substantive due process and Fourth Amendment rights, including:

(a) Facilitating, organizing, and tolerating youth-on-youth gladiatorial combat ("fades"), particularly in unmonitored blind spots such as the facility linen closet and recreation yards;

(b) Permitting sworn probation personnel with known street-gang affiliations to supervise detained youth, use gang intimidation, enforce gang rivalries, and retaliate against non-compliant youth;

(c) Conducting suspicionless, mass, humiliating strip and visual body cavity searches of minors in public or semi-public spaces

without reasonable suspicion, individualized justification, or visual privacy;

(d) Delaying, withholding, and mocking emergency medical care for youth experiencing acute drug overdoses and medical emergencies, and actively discouraging or delaying the summoning of immediate hospital care;

(e) Enforcing a strict "code of silence" among probation officers and detention staff, covering up staff misconduct, and failing to investigate, discipline, or terminate staff who abuse minors; and

(f) Systematically withholding and failing to provide juvenile grievance forms, thereby actively obstructing detained youth from filing grievances under Title 15, CCR Section 1361.

291. Defendant COUNTY OF LOS ANGELES had actual and constructive knowledge of these pervasive unconstitutional customs and conditions through:

(a) Repeated Board of State and Community Corrections (BSCC) inspection reports finding Los Padrinos unsuitable for youth confinement, noncompliant with Title 15 staffing ratios, and deficient in safety checks throughout 2024 and 2025;

(b) The March 2025 criminal indictments of 30 Los Angeles County probation officers for staging and orchestrating "gladiator fights";

(c) The 2023 overdose death at Barry J. Nidorf Juvenile Hall and repeated multi-million-dollar civil rights settlements regarding systemic abuse and unconstitutional conditions in County juvenile halls; and

(d) Detailed oversight presentations submitted directly to the Los Angeles County Board of Supervisors and the Probation Oversight Commission.

292. The COUNTY acted with deliberate indifference to the constitutional rights of detained minors by failing to adequately train, instruct, supervise, and discipline probation and medical personnel regarding:

(a) Proper protocols for emergency overdose response and the constitutional mandate to summon immediate medical treatment;

(b) Prevention of staff-on-youth sexual grooming, harassment, and abuse, as well as strict compliance with mandatory PREA requirements;

(c) De-escalation and lawful limits on the deployment of chemical agents (pepper spray); and

(d) The constitutional parameters of juvenile searches, including the strict prohibition against arbitrary, public mass strip and cavity searches.

293. The COUNTY's unconstitutional customs, policies, and deliberate failure to train and supervise were the direct moving force and proximate cause of the violations of Plaintiff's clearly established constitutional rights under the Fourth and Fourteenth Amendments, causing Plaintiff severe physical injury, extreme psychological trauma, and deprivation of bodily integrity. Plaintiff seeks compensatory damages, statutory damages, and attorneys' fees under 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

1. WHEREFORE, Plaintiff JOHN DOE respectfully prays for judgment against all Defendants, and each of them, jointly and severally, as follows:

(a) General Damages, including emotional distress and pain and suffering, in an amount according to proof at trial;

(b) Special Damages, including but not limited to medical and psychological expenses, in an amount according to proof at trial;

(c) Punitive and Exemplary Damages against all individual Defendants sued in their individual capacities, in an amount to be determined at trial, to deter and punish outrageous conduct;

(d) Statutory Damages, Civil Penalties, and Equitable Relief as authorized under 42 U.S.C. § 1983, the Bane Act (Cal. Civ. Code § 52.1), California Civil Code § 52.5;

(e) Attorney's Fees and Costs of Suit under 42 U.S.C. § 1988, California Civil Code §§ 52 and 52.1, and any other applicable provision of law;

(f) Pre-judgment and Post-judgment Interest as allowed by law; and

(g) Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, JOHN DOE, hereby demands a trial by jury on all claims and issues so triable.

Dated: October 28, 2026

THE WESTMORELAND LAW FIRM, P.C.

By: /s/ Rachel P. Jacobs
Dominique N. Westmoreland
Yesha H. Patel
Rachel P. Jacobs
Attorneys for Plaintiff, JOHN DOE

**PROOF OF SERVICE**

I am employed in the County of Los Angeles, State of California. I am over the age of eighteen (18) and am not a party to this action. My business address is 609 Deep Valley Drive, Suite 200, Rolling Hills Estates, California 90274.

On October 28, 2026, I served the following document(s) on all interested parties in this action as follows:

**FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

Andrew Baum
abaum@glaserweil.com
James Sargent
jsargent@glaserweil.com
Simon K. Moradzadeh
smoradzadeh@glaserweil.com
GLASER WEIL FINK HOWARD JORDAN & SHAPIRO LLP
10250 Constellation Blvd., 19th Floor, Los Angeles, California 90067
Telephone: (310) 553-3000
Attorneys for Defendants COUNTY OF LOS ANGELES and
GUILLERMO VIERA ROSA

[X] BY CM/ECF NOTICE OF ELECTRONIC FILING: I caused the above-listed document(s) to be electronically filed with the Clerk of the Court using the CM/ECF system. The CM/ECF system will send notice of such filing to all counsel of record registered to receive electronic notice in this action. (Fed. R. Civ. P. 5(b)(2)(E).)

[ ] BY ELECTRONIC MAIL: I transmitted a true and correct PDF copy of the above-listed document(s) by electronic mail to the counsel identified above at the email addresses listed above. (Fed. R. Civ. P. 5(b)(2)(E).)

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 28, 2026, in Rolling Hills Estates, California.

/s/ Rachel P. Jacobs
Rachel P. Jacobs